# Exhibit F

 Positive
As of: August 5, 2019 8:16 PM Z

# *Quilling v. Stark*

United States District Court for the Northern District of Texas, Dallas Division

June 19, 2006, Decided ; June 19, 2006, Filed

CIVIL ACTION NO. 3:05-CV-1976-L ECF

**Reporter**
2006 U.S. Dist. LEXIS 40672 *; 2006 WL 1683442

MICHAEL J. QUILLING, as Receiver for Sardkauer Holdings, IBC and Bradley C. Stark, Plaintiff, v. JOHN W. STARK, JR., ET AL., Defendants.

**Subsequent History:** Summary judgment granted by, Judgment entered by *Quilling v. Stark, 2007 U.S. Dist. LEXIS 8695 (N.D. Tex., Feb. 7, 2007)*

**Prior History:** *Quilling v. Stark, 2006 U.S. Dist. LEXIS 100878 (N.D. Tex., May 22, 2006)*

## Core Terms

magistrate judge, recommendation

**Counsel:** **[*1]** For Michael J Quilling, Receiver for Sardaukar Holdings, IBC and Bradley C Stark, Plaintiff: Clark B Will, Michael D Clark, Quilling Selander Cummiskey & Lownds, Dallas, TX.

For John W Stark, Jr, Barbara Stark, Defendants: Mark A Castillo, Curtis Law Firm, Dallas, TX.

**Judges:** Sam A. Lindsay, United States District Judge.

**Opinion by:** Sam A. Lindsay

## Opinion

### ORDER

Pursuant to a standing order of reference, this case was referred to United States Magistrate Judge Jeff Kaplan for pretrial management on May 18, 2006. On May 22, 2006, the magistrate judge filed his Findings and Recommendation recommending that the court deny Defendants' Motion to Dismiss Under *Rules 12(b)(2)*, *12(b)(6)*, and *9(b)* of the Federal Rules of Civil Procedure. No objections were filed.

After making an independent review of the pleadings, files and records in this case, and the findings and recommendation of the magistrate judge, the court concludes that the findings of the United States Magistrate Judge are correct. The findings and recommendation of the magistrate judge are hereby **accepted** by the court. Accordingly, Defendants' Motion to Dismiss Under *Rules 12(b)(2)*, *12(b)(6)*, and *9(b)* of the Federal Rules of Civil Procedure **[*2]** is **denied.**

**It is so ordered** this 19th day of June, 2006.

Sam A. Lindsay

United States District Judge

_____

End of Document

JOANNA LIAPES

 Positive

As of: August 5, 2019 8:17 PM Z

## *Earle v. Aramark Corp.*

United States District Court for the Northern District of Texas, Dallas Division

August 16, 2004, Decided ; August 16, 2004, Filed

CIVIL ACTION NO. 3:03-CV-2960-K

**Reporter**

2004 U.S. Dist. LEXIS 16254 *; 2004 WL 1879884

DONNA EARLE, Plaintiff, VS. ARAMARK CORPORATION, Defendant.

**Subsequent History:** Summary judgment granted by, Cause dismissed by *Earle v. Aramark Corp., 2006 U.S. Dist. LEXIS 14374 (N.D. Tex., Mar. 29, 2006)*

**Disposition:** Motions denied.

## Core Terms

personal jurisdiction, prima facie case, defense motion, motion to dismiss, business card, contacts, lack of personal jurisdiction, alleges

## Case Summary

**Procedural Posture**

Plaintiff former employee brought suit in the United States District Court for the Northern District of Texas, Dallas Division against defendant, her former employer, in connection with her termination from her job. The employer brought a motion to dismiss, alleging that the employee had sued the wrong party. The employee responded that the employer was the proper party and that it was subject to the personal jurisdiction of Texas courts.

**Overview**

Whether the employer as its corporate entity or its subsidiary was the employer was the central issue in the motion to dismiss. The court held that the Texas long-arm statute applied. The employee claimed that the court had personal jurisdiction over her by way of both general and specific jurisdiction. Responding to the evidence against her case for personal jurisdiction, the employee presented the following arguments to the court: (1) despite the information included on her W-2's, the corporation was the entity which paid her salary; (2) the corporation hired the employee and others in Texas

to solicit business on its behalf; and (3) the corporation provided the employee with "indicia of employment," including business cards, company letterhead, wages, benefits, a company vehicle, and a corporate credit card. The court held that the stationary and business cards, along with the existence of the check stubs, pay statement, and American Express corporate cards bearing the name of the corporation, tended to support a prima facie case that the employee had indeed been employed by the corporate entity establishing a prima facie case of specific jurisdiction over the corporation.

**Outcome**

The employer's motion to dismiss for lack of personal jurisdiction was denied. The employer's motion to extend the mediation deadline was granted. The parties were ordered to mediate the case by October 1, 2004.

## LexisNexis® Headnotes

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > Constitutional Sources

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

*HN1*[⬚] **Constitutional Sources**

The Texas long-arm statute has the same scope as the U.S. Constitution, so a district court may only exercise

2004 U.S. Dist. LEXIS 16254, *16254

jurisdiction over a defendant if jurisdiction is consistent with the Due Process Clause.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Purposeful Availment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

HN2[⬚] Minimum Contacts

The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant when: (1) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" in that state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

HN3[⬚] Regarding personal jurisdiction, "minimum contacts" can be established through either specific jurisdiction or general jurisdiction. Specific jurisdiction over a nonresident defendant exists when it has purposefully directed its activities at the forum state and

the litigation results from alleged injuries that arise from or relate to those activities. General jurisdiction exists when the nonresident defendant's contacts with the forum state, although not related to the plaintiff's cause of action, are "continuous and systematic."

Evidence > Burdens of Proof > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > General Overview

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

HN4[⬚] Once a defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of establishing the court's jurisdiction over a defendant. In its response to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff cannot stand on its pleadings, but must, through affidavits or otherwise, set forth specific facts demonstrating that the court has jurisdiction.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

HN5[⬚] In a motion to dismiss for lack of personal jurisdiction, a court accepts as true that party's uncontroverted allegations, resolving in its favor all conflicts between the facts contained in the parties' affidavits and other documentation. However, the court is not required to give credit to conclusory allegations, even if they are uncontroverted.

Evidence > Burdens of Proof > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > General Overview

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

_HN6_[⬇] A plaintiff's burden in responding to a defendant's motion to dismiss for lack of personal jurisdiction is raised from a prima facie showing to a preponderance of the evidence if the trial court holds an evidentiary hearing or the case proceeds to trial.

**Counsel: [\*1]** For Donna Earle, Plaintiff: D'Metria Benson, Law Office of D'Metria Benson, Dallas, TX.

For Aramark Corporation, Defendant: Bryant S McFall, Ogletree Deakins Nash Smoak, Stewart -- Dallas, Dallas, TX. Jeffrey C Londa, Ogletree Deakins Nash Smoak & Stewart, Houstam. TX.

Aramark Business Dining Services of Texas Inc, Defendant.

**Judges:** ED KINKEADE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ED KINKEADE

# Opinion

## MEMORANDUM OPINION AND ORDER

The following motions are currently pending before the Court: (1) Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service of Process; (2) Plaintiff's Motion to File Surreply in Opposition to Defendant's Motion to Dismiss; and (3) Plaintiff's Motion to Strike the Affidavit of Marge Layton. Because Plaintiff has met her burden of establishing a prima facie case of personal jurisdiction over Defendant, each motion is **DENIED**.

## I. Background

Plaintiff Donna Earle ("Earle") sues Defendant Aramark Corporation Aramark Corporation in connection with her termination from her job on or about April 11, 2003. Earle alleges that Aramark Corporation discriminated against her on the basis of her age and sex, and **[\*2]** also that she suffered from a hostile work environment during the course of her employment. In addition, Earle argues that Aramark Corporation is liable to her for damages based on contracts which she closed in the period before her official termination, based on the belief that she would be paid for such efforts. She alleges that Aramark Corporation never paid her for those amounts.

Aramark Corporation brought its motion to dismiss, alleging that Earle has sued the wrong party. Aramark Corporation alleges that Earle's actual employer was Aramark Services, Inc. ("Aramark Services"), but that Earle "stubbornly insists upon maintaining this lawsuit against Aramark Corporation." Earle responds that Aramark Corporation is the proper party to this litigation, and that it is subject to the personal jurisdiction of Texas courts. Whether Aramark Corporation or Aramark Services was Earle's employer is the issue central to this motion to dismiss.

## II. Standard on a Motion to Dismiss

The Texas long-arm statute applies in this case. _HN1_[⬆] The Texas long-arm statute has the same scope as the U.S. Constitution, so this Court may only exercise jurisdiction over the Defendant if jurisdiction **[\*3]** is consistent with the _Due Process Clause_. See _Alpine View Co. v. Atlas Copco A.B., 205 F.3d 208, 214 (5th Cir. 2000)_. _HN2_[⬆] _The Due Process Clause_ permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" in that state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." _Id. at 214-15_ (quoting _International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945))_.

_HN3_[⬆] "Minimum contacts" can be established through either specific jurisdiction or general jurisdiction. See _Alpine View, 205 F.3d at 215_. Specific jurisdiction over a nonresident defendant exists when it has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise from or relate to those activities. See _id._ (quoting _Burger King Corporation v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985))_. General jurisdiction exists when the **[\*4]** nonresident defendant's contacts with the forum state, although not related to the plaintiff's cause of action, are "continuous and systematic." _Alpine View, 205 F.3d at 215_ (quoting _Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984)_.

_HN4_[⬆] Once a defendant presents a motion to dismiss

for lack of personal jurisdiction, the plaintiff has the burden of establishing the Court's jurisdiction over a defendant. *See* *Gundle Lining Constr. v. Adams Cty. Asphalt, Inc., 85 F.3d 201, 204 (5th Cir. 1996).* In its response to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff cannot stand on its pleadings, but must, through affidavits or otherwise, set forth specific facts demonstrating that the Court has jurisdiction. *See* *Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991).*

When the Court does not conduct an evidentiary hearing, the party seeking to assert jurisdiction must present facts sufficient to make out a prima facie case supporting personal jurisdiction. *See* *Alpine View, 205 F.3d at 215.* HN5[⊞] The Court accepts as true that party's [*5] uncontroverted allegations, resolving in its favor all conflicts between the facts contained in the parties' affidavits and other documentation. *See id.* However, the Court is not required to give credit to conclusory allegations, even if they are uncontroverted. See *Panda v. Brandywine Corporation v. Potomac Elec. Power Comp., 253 F.3d 865, 868-69 (5th Cir. 2001).*

### III. Plaintiff Has Met Her Burden of Establishing Jurisdiction

Earle claims that the Court has personal jurisdiction over Aramark by way of both general and specific jurisdiction. Aramark claims that the Court has neither.

In her First Amended Complaint ("Complaint"), Earle claims that she was employed by Aramark Corporation in Dallas County, Texas, from June 26, 1989 through April 11, 2003. Earle's Complaint contends that although Aramark Corporation is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania, it conducts business in Dallas County, Texas. Through the affidavit of Peter A. Oppenheim, Aramark Corporation's Director of Corporate Claims, Aramark Corporation maintains that it is merely a holding company, registered to do business only within [*6] the Commonwealth of Pennsylvania. Mr. Oppenheim goes on to state that Aramark Corporation "did not employ Donna Earle. ARAMARK Corporation employs approximately 200 employees, all of whom are employed in Philadelphia, Pennsylvania."

Additionally, Aramark Corporation relies on Earle's 2002 and 2003 W-2's as evidence that Aramark Services was Earle's employer. On Earle's W-2's, the information under the heading for "Employer's Name" states

"ARAMARK FOOD&SUP SVCS AGENT FOR ARAMARK SERVICES." Also, the employer identification number on the W-2's is 23-2573585, which, according to Mr. Oppenheim, is Aramark Services' employer identification number.

Responding to Aramark Corporation's evidence against her case for personal jurisdiction, Earle presents the following arguments to the Court: (1) despite the information included on Earle's W-2's, Aramark Corporation was the entity which paid her salary; (2) Aramark Corporation hired Earle and others in Texas to solicit business on its behalf; and (3) Aramark Corporation provided Earle with "indicia of employment," including "business cards, company letterhead, wages, benefits, a company vehicle, and a corporate credit card.

In support of her [*7] arguments, Earle relies on several pieces of evidence: (1) a pay statement dated May 22, 2003, which clearly lists the name and address of Aramark Corporation; (2) stationary for Donna A. Earle with an "Aramark Corporation" heading; (3) three business cards for Donna A. Earle listing the Aramark Corporation name, with Texas addresses; (4) a letter to Earle from Patricia M. Lamont, Human Resource Director of Aramark Corporation, dated April 28, 2003, dealing with a complaint filed by Earle; (5) a statement of an American Express corporate card, issued to Earle in the name of Aramark Corporation; and (6) several stubs from reimbursement checks made out to Earle from Aramark Corporation.

Aramark Corporation responds to Earle's evidence, in part, with the affidavit of Marge Layton, the Director of Insured Litigation of Aramark Food and Support Services Group, Inc. In response to the evidence of Aramark Corporation stationary and business cards bearing Earle's name, Ms. Layton's states that "employees of subsidiaries of Aramark Corporation "typically listed ARAMARK Corporation' on the business cards and letterhead as a trade name or a method of branding." However, the stationary and business [*8] cards, along with the existence of the check stubs, pay statement, and American Express corporate cards bearing the name of "Aramark Corporation," tend to support a prima facie case that Earle was indeed employed by Aramark Corporation.

While Aramark Corporation contends that Earle has failed to prove that Earle's relationship with Aramark Services should not be attributed to Aramark Corporation, Earle does not make that argument to the

Court. Accordingly, the cases Aramark Corporation cites in support of its argument that Aramark Corporation's contacts with Texas are insufficient to support the exercise of personal jurisdiction are inapposite. *See, e.g., Gerald v. Pacificare Health Systems, 1997 U.S. Dist. LEXIS 4980, 1997 WL 160191(N.D. Tex. April 1, 1997)* (Fitzwater, J.). In *Gerald*, the Court held that the plaintiff did not establish a prima facie case of personal jurisdiction against one of the defendants when the evidence showed that she was employed by the wholly-owned subsidiary of that defendant. The court held that because the contacts of the subsidiary could not be imputed to the dismissed defendant, specific jurisdiction was improper, and the dismissed defendant did not have **[*9]** sufficient contacts to exercise general jurisdiction. *See 1997 U.S. Dist. LEXIS 4980, [WL] at *3-4.* In this case, however, Earle attempts to show that Aramark Corporation itself is her employer, not that the actions of Aramark Services should be attributed to it.

The evidence Earle has submitted to the Court does establish a prima facie case that Aramark Corporation was her employer. Not only did she receive stationary and business cards in her name bearing the words "Aramark Corporation," but the evidence indicates that she also received pay from Aramark Corporation, both in the form of her salary and through reimbursements. Therefore, while Aramark Corporation has presented evidence that Earle was employed by Aramark Services, Earle has nevertheless put forth sufficient evidence to make a prima facie showing that Aramark Corporation was her employer. As the events giving rise to this lawsuit undoubtedly arise from Earle's relationship with her employer, a prima facie case of Earle's employment by Aramark Corporation suffices to establish a prima facie case of specific jurisdiction over Aramark Corporation.

Thus, Earle has met her burden of presenting evidence which establishes a prima facie case of personal **[*10]** jurisdiction. However, the Court reiterates that at some point, Earle will have to establish jurisdiction over Aramark Corporation by a preponderance of the evidence -- a burden which is higher than that applicable to the current motion, which is merely a prima facie case. *See Felch v. Transportes Lar-Mex SA De CV, 92 F.3d 320, 326 (5th Cir. 1996)* (holding that the *HN6*[⬆] plaintiff's burden in responding to a defendant's motion to dismiss for lack of personal jurisdiction is raised from a prima. facie showing to a preponderance of the evidence if the trial court holds an evidentiary hearing or the case proceeds to trial). Accordingly, while the Court **DENIES** Defendant's motion at this time, it explicitly refrains from ruling that Plaintiff has established personal jurisdiction by a preponderance of the evidence.

## IV. Conclusion

Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is hereby **DENIED**. In addition to the motion to dismiss, two motions relating to the motion to dismiss are currently pending before the Court. First, Plaintiff filed a motion to file a surreply. As the Court has denied defendant's motion without regards to a surreply, **[*11]** that motion is **DENIED** as moot. Additionally, Plaintiff's motion to strike the affidavit of Marge Layton is **DENIED**. Finally, Defendant has filed a motion to extend the mediation deadline. Defendant's motion is **GRANTED**. The parties are **ORDERED** to mediate this case by October 1, 2004.

**SO ORDERED**

August 16th, 2004.

ED KINKEADE

UNITED STATES DISTRICT JUDGE

_____

End of Document

JOANNA LIAPES

**A** Neutral

As of: August 5, 2019 8:19 PM Z

## *ACS Partners, LLC v. GFI Mgmt. Servs.*

United States District Court for the Southern District of Texas, Houston Division

December 23, 2015, Decided; December 23, 2015, Filed

CIVIL ACTION NO. H-15-1111

**Reporter**

2015 U.S. Dist. LEXIS 171424 *

ACS PARTNERS, LLC, Plaintiff, v. GFI MANAGEMENT SERVICES, INC., Defendant.

**Subsequent History:** Motion granted by, Motion denied by *ACS Partners, LLC v. GFI Mgmt. Servs., 2016 U.S. Dist. LEXIS 106086 (S.D. Tex., Aug. 11, 2016)*

**Prior History:** *ACS Partners, LLC v. Gross, 2012 Tex. App. LEXIS 3697 (Tex. App. Houston 1st Dist., May 4, 2012)*

## Core Terms

personal jurisdiction, alter ego theory, minimum contact, jurisdictional

**Counsel:** [*1] For ACS Partners, LLC, Plaintiff, Counter Defendant: Jason David Kraus, Bouman Kraus, PC, Houston, TX.

For GFI Management Services, Inc., Defendant, Counter Claimant: Brian Pascal Cweren, LEAD ATTORNEY, Attorney at Law, Houston, TX; Kyle Guthrie Thomas, LEAD ATTORNEY, The Cweren Law Firm, Houston, TX.

For Allen Gross, Defendant: Constantine Z Pamphilis, LEAD ATTORNEY, Kasowitz Benson, Torres & Friedman,LLP, Houston, TX.

**Judges:** NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** NANCY F. ATLAS

## Opinion

### MEMORANDUM AND ORDER

This case is before the Court on the Motion to Dismiss

for Lack of Personal Jurisdiction [Doc. # 31] filed by Defendant Allen Gross, to which Plaintiff ACS Partners, LLC ("ACS") filed a Response [Doc. # 32], and Gross filed a Reply [Doc. # 33]. The Court conducted a hearing on Gross's Motion to Dismiss on October 13, 2015, at which time Plaintiff requested and obtained leave to conduct jurisdictional discovery. By Order [Doc. # 45] entered November 2, 2015, the Court directed Plaintiff to file any supplemental briefing by December 14, 2015.

The deadline for completing the jurisdictional discovery has expired, and Plaintiff has advised the Court that no supplemental briefing or evidence [*2] will be filed. Having reviewed the full record and applicable legal authorities, the Court **grants** Gross's Motion to Dismiss.

### I. BACKGROUND

In June 2012, Plaintiff and Defendant GFI entered into a settlement agreement to resolve a lawsuit in Texas state court. Gross was not a party to the settlement agreement between ACS and GFI. Plaintiff filed this lawsuit against GFI, alleging that it breached the settlement agreement by failing to offer to ACS construction work opportunities as required under the agreement. Plaintiff later filed an Amended Complaint [Doc. # 7] against GFI, then filed a Second Amended Complaint [Doc. # 17] adding Gross as a Defendant.

Gross, a resident of New York, filed a Motion to Dismiss for lack of personal jurisdiction. In response, Plaintiff argues that an "alter ego" exception allows the Court to "fuse" a corporation and its officers or directors for personal jurisdiction purposes. Gross's Motion to Dismiss has been fully briefed, has been argued, and the parties have conducted jurisdictional discovery. The Motion to Dismiss is now ripe for decision.

### II. LEGAL STANDARD FOR PERSONAL JURISDICTION

JOANNA LIAPES

2015 U.S. Dist. LEXIS 171424, *2

The plaintiff has the burden of establishing that this Court has personal [*3] jurisdiction over Gross. See *Int'l Energy Ventures Mgmt., LLC v. United Energy Group, Ltd., 800 F.3d 143, 151 (5th Cir. 2015)*. The parties have submitted evidence in connection with Gross's Motion to Dismiss, but the Court did not conduct a full evidentiary hearing. As a result, the Court will consider the evidence presented by the parties "to help it resolve the jurisdictional issue," but will "construe all disputed facts in Plaintiff's favor and consider them along with the undisputed facts." See *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 241 (5th Cir. 2008)*.

Courts in Texas may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *DeJoria v. Maghreb Petroleum Expl., S.A., 804 F.3d 373, 388 (5th Cir. 2015)* (citing *Moncrief Oil Int'l, Inc. v. OAO Gazprom, 414 S.W.3d 142, 149 (Tex. 2013))*. In Texas, the long-arm statute extends to the limits of federal constitutional due process. See *Companion Prop. & Cas. Ins. Co. v. Palermo, 723 F.3d 557, 559 (5th Cir. 2013)*.

"Asserting personal jurisdiction comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice." *DeJoria, 804 F.3d at 388* (citing *Moncrief, 414 S.W.3d at 150*). A defendant establishes minimum contacts with a state when he purposefully avails himself "of the privilege of conducting activities within the forum state, thus invoking [*4] the benefits and protections of its laws." *Id.* (citations omitted). "In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice." *Id.* (quoting *Moncrief, 414 S.W.3d at 154*).

In this case, there is no dispute that Gross personally does not have minimum contacts with Texas that would support the exercise of personal jurisdiction over him in this Court. Instead, Plaintiff seeks through an alter ego theory to attribute to Gross the minimum contacts of GFI, over whom personal jurisdiction is uncontested. "The Texas Supreme Court has held that jurisdiction based on an alter ego theory cannot be found unless '[t]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate

entities [proves] this allegation.'" *Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P., 184 S.W.3d 242, 250 (Tex. App. — Houston [1st Dist.] 2005, no pet.)* (quoting *BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex. 2002))*. Although the Texas Supreme Court's decision in *BMC* was in the context of two corporations (a parent and a subsidiary), the Texas Court of Appeals in *Tri-State* extended the doctrine to provide a basis for personal jurisdiction over an officer or director of a corporation. See *id.* Placing on the plaintiff the burden [*5] of proof on the jurisdictional issue is appropriate because there exists a presumption of legal separateness with regard to a corporation and its officers. See *id.* (citing *Pabich v. Kellar, 71 S.W.3d 500, 507 (Tex. App. — Fort Worth 2002, pet. denied)*; *Wynne v. Adcock Pipe and Supply, 761 S.W.2d 67, 68 (Tex. App. — San Antonio 1988, writ denied))*.

To "fuse" GFI and Gross for personal jurisdictional purposes, Plaintiff must prove that Gross controls the internal business operations and affairs of GFI, but the degree of control must be greater than that normally associated with ownership of a closely-held corporation; "the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." See *PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163, 175 (Tex. 2007)* (quoting *BMC, 83 S.W.3d at 799*). The alter ego theory provides a basis for personal jurisdiction over a nonresident who has no minimum contacts with the forum state only "when there is such unity between a corporation and an individual that the separateness of the corporation has ceased and holding only the corporation liable would result in an injustice." *Nichols v. Tseng Hsiang Lin, 282 S.W.3d 743, 747 (Tex. App. — Dallas 2009, no pet.)* (citing *Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990))*. The types of evidence a court will consider as proof of an alter ego theory include: (1) the payment of alleged corporate debts with personal checks or [*6] other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate." *Id.* (citing *Mancorp, 802 S.W.2d at 229*). An individual's status as an officer, director, or majority shareholder of a corporation alone is insufficient to support the exercise of personal jurisdiction based on an alter ego theory. *Id.* (citing *Goldstein v. Mortenson, 113 S.W.3d 769, 781 (Tex. App. — Austin 2003, no pet.)*.

JOANNA LIAPES

2015 U.S. Dist. LEXIS 171424, *6

## III. ANALYSIS

The evidence relevant to Plaintiff's alter ego theory is either uncontradicted or viewed in the light most favorable to Plaintiff. It is undisputed that Gross is the sole shareholder of GFI and is the Chairman of its Board of Directors. In 2013, Jeff Adler was the Chief Executive Officer ("CEO") of GFI, Michael Wiser was its Executive Vice President, and David Arno was in charge of operations. *See* 2013 Deposition Testimony of Allen Gross, Exh. 1 to Plaintiff's Evidentiary Submission in Response to Gross's Motion to Dismiss ("Plaintiff's Evidentiary Submission") [Doc. # 35]. Earlier, in 2010, Frederick Mehlman was the CEO of GFI. At that time, **[*7]** Judith Crook (Controller), Helen Gotman (Head of Asset Management), and five regional managers reported to Mehlman. *See* 2010 Deposition Testimony of Frederick Mehlman, Exh. 2 to Plaintiff's Evidentiary Submission, pp. 6-7.

It is undisputed that GFI has its own corporate bank accounts, and there is no evidence that Gross has ever paid corporate debts with personal checks or otherwise commingled his funds and GFI's funds. Gross's uncontradicted sworn testimony is that he does not sign checks on behalf of GFI. There is no evidence that Gross has diverted GFI profits for his own personal use. Indeed, it is uncontroverted that Gross has not taken any distribution, dividend, or salary from GFI since at least June 2012. There is no evidence that he has represented that he is personally responsible for the corporation's debts, or that GFI is inadequately capitalized. There is no evidence that GFI's assets and Gross's assets are not maintained separately. The uncontroverted evidence in the record establishes that GFI and Gross maintain their separate identities. Plaintiff has failed to present evidence that supports its alter ego theory of personal jurisdiction over Gross, and the uncontroverted **[*8]** evidence in the record establishes that the alter ego theory does not apply in this case.

## IV. CONCLUSION AND ORDER

Plaintiff has failed to allege a factual or legal basis for this Court to exercise personal jurisdiction over Defendant Gross. As a result, it is hereby

**ORDERED** that Gross's Motion to Dismiss for Lack of Personal Jurisdiction [Doc. # 31] is **GRANTED** and Plaintiff's claims against Defendant Gross are **DISMISSED**.

SIGNED at Houston, Texas, this **23rd** day of **December, 2016**.

/s/ Nancy F. Atlas

NANCY F. ATLAS

SENIOR UNITED STATES DISTRICT JUDGE

---

End of Document

JOANNA LIAPES



Home / Browse Decisions / FEDERAL TRADE COMMISSION v. ALL US MARKETING LLC

# FEDERAL TRADE COMMISSION v. ALL US MARKETING LLC

Case No. 6:15 CV 1016-ORL-28GJK.                                                   Email | Print | Comments (0)

### View Case

*FEDERAL TRADE COMMISSION, and STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, Plaintiffs, v. ALL US MARKETING LLC, f/k/a Payless Solutions, LLC, a Florida corporation; GLOBAL MARKETING ENTERPRISES INC., f/k/a Pay Less Solutions Inc., a Florida corporation; GLOBAL ONE FINANCIAL SERVICES LLC, a Florida corporation; YOUR #1 SAVINGS LLC, a Florida corporation; OVADAA LLC, a Florida corporation; ROYAL HOLDINGS OF AMERICA LLC, a Florida corporation; GARY RODRIGUEZ, individually and as an officer of YOUR #1 SAVINGS LLC, and also d/b/a Global Financial Services, LLC, Engineering Development Enterprise LLC, and PBMS, LLC; MARBEL RODRIGUEZ, individually and as an officer of GLOBAL ONE FINANCIAL SERVICES LLC, and also d/b/a American Best Savings LLC, and Americas First Source LLC; CARMEN WILLIAMS, individually and as an officer of OVADAA LLC; JONATHAN PAULINO, individually and as an officer of ROYAL HOLDINGS OF AMERICA LLC; FAIRIBORZ FARD, individually and as an officer of GLOBAL MARKETING ENTERPRISES INC. SHIRIN IMANI, individually and as an officer of GLOBAL MARKETING ENTERPRISES INC. and ALL US MARKETING LLC; and ALEX SERNA, individually and as an officer of ALL US MARKETING LLC, and also d/b/a GRR FINANCIAL SERVICES LLC and AJC Global Solutions LLC; Defendants.*

United States District Court, M.D. Florida, Orlando Division.

July 7, 2015.

---

*Attorney(s) appearing for the Case*

*Federal Trade Commission, Plaintiff, represented by <u>James H. Davis</u> , Federal Trade Commission, <u>John Hallerud</u> , Federal Trade Commission & <u>Elizabeth C. Scott</u> , Federal Trade Commission.*

*State of Florida, Office of the Attorney General, Department of Legal Affairs, Plaintiff, represented by <u>Denise Kim Beamer</u> , Office of the Attorney General.*

*Gary Rodriguez, Defendant, represented by <u>Thomas A. Sadaka</u> , Sadaka Law Group, PLC & <u>George Paul Chandler, IV</u> , Sadaka Law Group, PLC.*

*Marbel Rodriguez, Defendant, represented by <u>Thomas A. Sadaka</u> , Sadaka Law Group, PLC & <u>George Paul Chandler, IV</u> , Sadaka Law Group, PLC.*

*Mark J. Bernet, Receiver, represented by <u>Mark James Bernet</u> , Akerman LLP.*

---

## PRELIMINARY INJUNCTION AS TO DEFENDANT ALL US MARKETING LLC

**JOHN ANTOON, II,** *District Judge.*

Plaintiffs, Federal Trade Commission ("Commission" or "FTC") and the State of Florida, filed their Complaint for Permanent Injunction and Other Equitable Relief ("Complaint"), pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2014), and moved *ex parte* for a temporary restraining order ("TRO") pursuant to Rule 65 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 65, which the Court granted on June 22, 2015. This Court, having considered Plaintiffs' motion for a Preliminary Injunction, the declarations, exhibits, and memoranda filed in support therof, and hearing no opposition thereto, and other cause appearing, finds that:

1. This Court has jurisdiction over the subject matter of this case and jurisdiction over the All Us Marketing LLC;

2. Venue properly lies with this Court;

3. There is good cause to believe that the Defendant All Us Marketing LLC has engaged in, and is likely to engage in the future in, acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) various provisions of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and Section 501.204

of the FDUTPA, Chapter 501, Part II, Florida Statutes, and that Plaintiffs are therefore likely to prevail on the merits of this action;

4. There is good cause to believe that immediate and irreparable harm to the Court's ability to grant effective final relief for consumers in the form of monetary restitution will occur from the sale, transfer, or other disposition or concealment by All Us Marketing LLC of its assets or corporate records unless All Us Marketing LLC is immediately restrained and enjoined by Order of this Court. There is thus good cause for an asset freeze and the appointment of a permanent receiver over corporate defendant All Us Marketing LLC.

5. Weighing the equities and considering Plaintiffs' likelihood of ultimate success, a preliminary injunction is in the public interest.

6. No security is required of any agency of the United States for issuance of a preliminary injunction. Fed. R. Civ. P. 65(c). No bond is required with respect to relief requested pursuant this Court's Order entered on June 22, 2015.

## DEFINITIONS

For purposes of this Stipulated Preliminary Injunction ("Order"), the following definitions shall apply:

1. "Asset" or "Assets" means any legal or equitable interest in, right to, or claim to, any real or personal property, including, but not limited to, "goods," "instruments," "equipment," "fixtures," "general intangibles," "inventory," "checks," or "notes," (as these terms are defined in the Uniform Commercial Code), lines of credit, chattels, leaseholds, contracts, mail or other deliveries, shares of stock, lists of consumer names, accounts, credits, premises, receivables, funds, and all cash, wherever located.

2. "Assisting Others" includes, but is not limited to: (a) providing administrative services, including, but not limited to, filing business registrations with federal, state, or local government entities, establishing bank or merchant accounts, and/or handling banking transactions; (b) acting as an officer, director, or registered agent of a business entity; (c) establishing mail accounts or mail receiving boxes, and/or providing mailing or printing services; (d) performing customer service functions, including, but not limited to, forwarding mail received from consumers and/or receiving or responding to consumer complaints; (e) formulating or providing, or arranging for the formulation or provision of, any sales script or other marketing material; (f) providing names of, or assisting in the generation of, potential customers; and (g) performing or providing marketing or billing services of any kind, including, but not limited to, performing or providing telemarketing services.

3. "Individual Defendants" means Gary Rodriguez, Marbel Rodriguez, Carmen Williams, Jonathan Paulino, Fariborz Fard, Shirin Imani, and Alex Serna, and by whatever other names each may be known.

4. "Corporate Defendants" means All Us Marketing LLC, f/k/a Payless Solutions, LLC, Global Marketing Enterprises Inc., f/k/a Pay Less Solutions Inc., Global One Financial Services LLC, Your #1 Savings LLC, OVADAA LLC, and Royal Holdings Of America LLC, and their successors and assigns, as well as any subsidiaries, and any fictitious business entities or business names created or used by these entities, or any of them.

5. "Defendants" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

6. "Document" or "Documents" means any materials listed in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

7. "Financial Institution" means any bank, savings and loan institution, credit union, or any financial depository of any kind, including, but not limited to, any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer.

8. "National Do Not Call Registry" means the National Do Not Call Registry, which is the "do-not-call" registry maintained by the Federal Trade Commission pursuant to 16 C.F.R. § 310.4(b)(1)(iii)(B).

9. "Person" means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

10. "Plaintiffs" means the Federal Trade Commission ("FTC" or "Commission") and the State of Florida.

11. "Telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(bb).

12. "Telemarketing" means any plan, program, or campaign (whether or not covered by the TSR, 16 C.F.R. Part 310) that is conducted to induce the purchase of goods or services or a charitable contribution by use of one or more telephones.

I.

## PROHIBITED BUSINESS ACTIVITIES

IT IS THEREFORE ORDERED that All Us Marketing LLC, and its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, in connection with the telemarketing, advertising, marketing, promoting, offering for sale, sale, or provision of any good or service, are hereby restrained and enjoined from:

A. Misrepresenting, or assisting others in misrepresenting, directly or indirectly, expressly or by implication, any material fact, including, but not

limited to, that:

1. Defendants will substantially reduce consumers' credit card interest rates;

2. Defendants will save consumers thousands of dollars in a short time as a result of lowered credit card interest rates;

3. Defendants will enable consumers to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates; and

4. Defendants are representatives of, or otherwise affiliated with, consumers' banks or credit card companies;

B. Causing billing information to be submitted for payment without having obtained consumers' express informed consent;

C. Violating, or assisting others in violating, any provision of the Telemarketing Sales Rule, 16 C.F.R. Part 310, including, but not limited to:

1. Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x), by misrepresenting, directly or by implication, that:

a. Defendants will substantially lower consumers' credit card interest rates;

b. Defendants will save consumers thousands of dollars in a short time as a result of lowered credit card interest rates; and

c. Defendants will enable consumers to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates;

2. Section 310.4 (a)(2)(vii) of the TSR, 16 C.F.R. § 310.4(a)(2)(vii), by misrepresenting, directly or by implication, that Defendants are representatives of, or otherwise affiliated with, consumers' banks or credit card companies;

3. Section 310.4 (a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i), by requesting or receiving payment of any fee or consideration for debt relief services:

a. before (i) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (ii) the customer has made at least one payment pursuant to that agreement; and/or

b. when, to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (i) does not bear the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount, or (ii) is not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration and that percentage does not change from one individual debt to another;

4. Section 310.4(a)(7) of the TSR, 16 C.F.R. § 310.4(a)(7), by causing billing information to be submitted without the express informed consent of the consumer;

5. Section 310.4(b)(1)(iii)(B) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B), by engaging, or causing others to engage, in initiating an outbound telephone call to a person when that person's telephone number is on the National Do Not Call Registry;

6. Section 310.4(b)(1)(iii)(A) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A), by initiating, or causing others to initiate, an outbound telephone call to a person who previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered;

7. Section 310.4(a)(8) of the TSR, 16 C.F.R. § 310.4(a)(8), by failing to transmit or cause to be transmitted the telephone number and name of the telemarketer or seller to any caller identification service in use by a recipient of a telemarketing call;

8. Section 310.4(b)(1)(v)(A)(i) of the TSR, 16 C.F.R. § 310.4(b)(1)(v)(A), by initiating, or causing others to initiate, an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service, unless the seller has obtained from the recipient of the call an express agreement, in writing, that:

a. The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

b. The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

c. Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

d. Includes such person's telephone number and signature;

9. Section 310.4(d)(1), (2) and (3) of the TSR, 16 C.F.R. § 310.4(d)(1), (2) and (3), by failing to disclose truthfully, promptly and in a clear and conspicuous manner the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods or services; and

10. Section 310.4(b)(1)(v)(B)(ii) of the TSR, 16 C.F.R. § 310.4(b)(1)(v)(B)(ii), by initiating, or causing others to initiate, outbound telephone calls delivering prerecorded messages that do not promptly provide the disclosures required by Section 310.4(d) of the TSR.

II.

ASSET FREEZE

IT IS FURTHER ORDERED that All Us Marketing LLC, and its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, except as provided herein, as stipulated by the parties, or as directed by further order of the Court, are hereby restrained and enjoined from:

A. Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, shares of stock, lists of consumer names, or other assets, or any interest therein, wherever located, including outside the territorial United States, that are:

1. Owned, controlled, or held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Defendant;

2. In the actual or constructive possession of any Defendant; or

3. In the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Defendant, including, but not limited to, any assets held by or for any Defendant in any account at any bank or savings and loan institution, or with any credit card processing agent, automated clearing house processor, network transaction processor, bank debit processing agent, customer service agent, commercial mail receiving agency, or mail holding or forwarding company, or any credit union, retirement fund custodian, money market or mutual fund, storage company, trustee, or with any broker–dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other financial institution or depository of any kind, either within or outside the territorial United States;

B. Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant, or subject to access by any Defendant or under any Defendant's control, without providing Plaintiffs prior notice and an opportunity to inspect the contents in order to determine that they contain no assets covered by this Section;

C. Cashing any checks or depositing or processing any payments from customers of Defendants;

D. Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Defendant; or

E. Incurring liens or encumbrances on real property, personal property, or other assets in the name, singly or jointly, of any Defendant or of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant.

The funds, property, and assets affected by this Section shall include both existing assets and assets acquired after the effective date of this Order.

III.

# DUTIES OF THIRD PARTIES HOLDING ALL US MARKETING LLC'S ASSETS

IT IS FURTHER ORDERED that any financial institution, business entity, or person maintaining or having custody or control of any account or other asset of All Us Marketing LLC, or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by, or under common control with All Us Marketing LLC, which is served with a copy of this Order, or otherwise has actual or constructive knowledge of this Order, shall:

A. Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of any of the assets, funds, documents, or other property held by, or under its control:

1. On behalf of, or for the benefit of, All Us Marketing LLC or any other party subject to Section II above;

2. In any account maintained in the name of, or for the benefit of, or subject to withdrawal by, All Us Marketing LLC or other party subject to Section II above; and

3. That are subject to access or use by, or under the signatory power of, All Us Marketing LLC or other party subject to Section II above;

B. Deny All Us Marketing LLC access to any safe deposit boxes or storage facilities that are either:

1. Titled in the name, individually or jointly, of any Defendant, or other party subject to Section II above; or

2. Subject to access by any Defendant or other party subject to Section II above;

C. Provide Plaintiffs, within five (5) days of the date of service of this Order, a sworn statement setting forth:

1. The identification number of each account or asset titled in the name, individually or jointly, of All Us Marketing LLC, or held on behalf of, or for the benefit of All Us Marketing LLC or other party subject to Section II above, including all trust accounts managed on behalf of All Us Marketing LLC or subject to All Us Marketing LLC's control;

2. The balance of each such account, or a description of the nature and value of such asset;

3. The identification and location of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of All Us Marketing LLC, or is otherwise subject to access or control by All Us Marketing LLC or other party subject to Section II above, whether in whole or in part; and

4. If the account, safe deposit box, storage facility, or other asset has been closed or removed, the date closed or removed and the balance on said date;

D. Within five (5) days of a request from any Plaintiff, provide Plaintiffs with copies of all records or other documents pertaining to each such account or asset, including, but not limited to, originals or copies of account applications, account statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

E. Plaintiffs may properly serve this Order on any financial or brokerage institution, business entity or person that holds, controls or maintains custody of any account or Asset of All Us Marketing LLC or has held, controlled or maintained custody of any account or Asset of any All Us Marketing LLC at any time since August 2011, by facsimile transmission, hand delivery or overnight carrier.

F. This Section shall apply to existing accounts and assets, assets deposited or accounts opened after the effective date of this Order, and any accounts or assets maintained, held or controlled three years prior to the effective date of this Order. This Section shall not prohibit transfers in accordance with any provision of this Order, any further order of the Court, or by written agreement of the parties.

IV.

## FINANCIAL STATEMENTS

IT IS FURTHER ORDERED that All Us Marketing LLC shall serve upon counsel for Plaintiffs, unless previously submitted in full compliance with the TRO, no later than five (5) business days after entry of this Order, a completed financial statement, accurate as of the date of entry of this Order, on the forms served on Defendants with this Order for Individual Defendants and for Corporate Defendants, as the case may be, signed under penalty of perjury.

The financial statements shall include assets held outside the territory of the United States, shall be accurate as of the date of the entry of this Order, and shall be verified under oath. All Us Marketing LLC shall attach to these completed financial statements copies of all local, state, provincial, and federal income and property tax returns, with attachments and schedules, as called for by the instructions to the financial statements.

V.

## MAINTAIN RECORDS AND REPORT NEW BUSINESS ACTIVITY

IT IS FURTHER ORDERED that All Us Marketing LLC, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, are hereby restrained and enjoined from:

A. Failing to make and keep books, records, accounts, bank statements, current accountants' reports, general ledgers, general journals, cash receipts ledgers, cash disbursements ledgers and source documents, documents indicating title to real or personal property, and any other data which, in reasonable detail, accurately and fairly reflect the incomes, disbursements, transactions, dispositions, and uses of All Us Marketing LLC's assets;

B. Destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any documents, including electronically stored materials, that relate in any way to the business practices or business or personal finances of Defendants; to the business practices or finances of entities directly or indirectly under the control of Defendants; or to the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

C. Creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing Plaintiffs with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

VI.

## PROHIBITION ON DISCLOSING CUSTOMER INFORMATION

IT IS FURTHER ORDERED that All Us Marketing LLC, and its officers, agents, servants, employees, attorneys, and all other persons or entities in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, are hereby restrained and enjoined from:

A. Selling, renting, leasing, transferring, or otherwise disclosing the name, address, birth date, telephone number, e-mail address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with activities alleged in Plaintiffs' Complaint; and

B. Benefiting from or using the name, address, birth date, telephone number, e-mail address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with activities alleged in Plaintiffs' Complaint;

*Provided, however,* that All Us Marketing LLC may disclose such financial or identifying personal information to a law enforcement agency or as

required by any law, regulation, or court order.

VII.

PERMANENT RECEIVER

A. APPOINTMENT OF PERMANENT RECEIVER

IT IS FURTHER ORDERED that Mark Bernet, Esq. is appointed Permanent Equity Receiver ("Receiver") for All Us Marketing LLC and any of its affiliates, subsidiaries, divisions, or sales or customer service operations, wherever located, with the full power of an equity receiver. The Receiver shall be the agent of this Court, and solely the agent of this Court, in acting as Receiver under this Order. The Receiver shall be accountable directly to this Court. The Receiver shall comply with all Local Rules of this Court governing receivers.

B. RECEIVERSHIP DUTIES

IT IS FURTHER ORDERED that the Receiver is directed and authorized to accomplish the following:

1. Assume full control of the All Us Marketing LLC by removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Corporate Defendants, including any Individual Defendant, from control of, management of, or participation in, the affairs of the All Us Marketing LLC t;

2. Take exclusive custody, control, and possession of all assets and documents of, or in the possession, custody, or under the control of, All Us Marketing LLC, wherever situated. The Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all assets and documents of the All Us Marketing LLC and other persons or entities whose interests are now held by or under the direction, possession, custody, or control of All Us Marketing LLC. Provided, however, that the Receiver shall not attempt to collect any amount from a consumer or to allow All Us Marketing LLC to continue to debit or otherwise charge a consumer's account, if the Receiver believes the consumer was a victim of the unfair or deceptive acts or practices alleged in the Complaint in this matter;

3. Use any means necessary to take possession of and to secure all areas of the business premises of the All Us Marketing LLC. Such steps may include, but are not limited to, the following as the Receiver deems necessary or advisable: (a) serving this Order; (b) completing a written inventory of all receivership assets; (c) obtaining pertinent information from all employees and other agents of the All Us Marketing LLC t, including, but not limited to, the name, home address, Social Security number, job description, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (d) videotaping all portions of the locations; (e) securing the locations by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at the locations; (f) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises documents or assets of All Us Marketing LLC; and/or (g) employ the assistance of law enforcement officers as the Receiver deems necessary to implement the provisions of this Order;

4. Conserve, hold, and manage all receivership assets, and perform all acts necessary or advisable to preserve the value of those assets, in order to prevent any irreparable loss, damage, or injury to consumers or to creditors of All Us Marketing LLC, including, but not limited to, obtaining an accounting of the assets and preventing transfer, withdrawal, or misapplication of assets, and including the authority to liquidate or close out any open securities or commodity futures positions of All Us Marketing LLC;

5. Enter into contracts and purchase insurance as advisable or necessary;

6. Prevent the inequitable distribution of assets and determine, adjust, and protect the interests of consumers and creditors who have transacted business with All Us Marketing LLC;

7. Manage and administer the business of All Us Marketing LLC until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

8. Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

9. Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by All Us Marketing LLC prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure assets of All Us Marketing LLC, such as rental payments;

10. Determine and implement the manner in which All Us Marketing LLC will comply with, and prevent violations of, this Order and all other applicable laws;

11. Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts that the Receiver deems necessary and advisable to preserve or recover the assets of All Us Marketing LLC or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

12. Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his or her role as Receiver, or against All Us Marketing LLC that the Receiver deems necessary and advisable to preserve the assets of All Us Marketing LLC or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

13. Continue and conduct the business of All Us Marketing LLC t in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; provided, however, that the continuation and conduct of the businesses shall be conditioned upon the Receiver's good faith determination that the business can be lawfully operated at a profit using the assets of the receivership estate;

14. Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate;

15. Open one or more bank accounts as designated depositories for funds of the All Us Marketing LLC. The Receiver shall deposit all funds of the All Us Marketing LLC in such a designated account and shall make all payments and disbursements from the receivership estate from such an account;

16. Maintain accurate records of all receipts and expenditures that he or she makes as Receiver;

17. Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency, including Plaintiffs; and

18. File reports with the Court on a timely and reasonable basis.

## C. COOPERATION WITH THE RECEIVER

IT IS FURTHER ORDERED that:

1. All Us Marketing LLC and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, shall fully cooperate with and assist the Receiver. This cooperation and assistance shall include, but not be limited to:

a. Providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order;

b. Providing any password required to access any computer, electronic file, or telephonic data in any medium; or

c. Advising all persons who owe money to All Us Marketing LLC that all debts should be paid directly to the Receiver.

2. Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, are hereby restrained and enjoined from directly or indirectly:

a. Transacting any of the business of All Us Marketing LLC;

b. Destroying, secreting, defacing, transferring, or otherwise altering or disposing of any documents of All Us Marketing LLC, including, but not limited to, books, records, accounts, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations, electronically-stored records, or any other records of any kind or nature;

c. Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, All Us Marketing LLC, or the Receiver;

d. Excusing debts owed to All Us Marketing LLC;

e. Failing to notify the Receiver of any asset, including accounts, of All Us Marketing LLC held in any name other than the name of All Us Marketing LLC, or by any person or entity other than All Us Marketing LLC, or failing to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such assets;

f. Doing any act or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or managing of the assets or documents subject to this receivership; or to harass or interfere with the Receiver in any way; or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of All Us Marketing LLC; or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any Order of this Court; or

g. Filing, or causing to be filed, any petition on behalf of All Us Marketing LLC for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., without prior permission from this Court.

## D. DELIVERY OF RECEIVERSHIP PROPERTY

IT IS FURTHER ORDERED that:

1. Immediately upon entry of this Order, or within such period as may be permitted by the Receiver, Defendants or any other person or entity shall transfer or deliver possession, custody, and control of the following to the Receiver:

a. All assets of, including assets subject to repatriation pursuant to Section IX, *infra*;

b. All documents of All Us Marketing LLC, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

c. All assets belonging to members of the public now held by All Us Marketing LLC; and

d. All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of All Us Marketing LLC, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, mail boxes, or other property. This includes providing the necessary means to gain access to commercial mail boxes.

2. In the event any person or entity fails to deliver or transfer any receivership asset or document or otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte* an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, document, or other thing and to deliver it to the Receiver.

## E. TRANSFER OF FUNDS TO THE RECEIVER

IT IS FURTHER ORDERED that, upon service of a copy of this Order, all financial institutions, finance companies, commercial lending companies, credit card processing agents or agents providing electronic funds transfer services or automated clearing house processing, brokerage houses, escrow agents, money market or mutual funds, title companies, commodity futures merchants, commodity trading companies, precious metal dealers, trustees, or other financial institutions or depositories of any kind, shall cooperate with all reasonable requests of the Receiver relating to implementation of this Order, including transferring funds at his or her direction and producing records related to the assets of All Us Marketing LLC.

## F. STAY OF ACTIONS

IT IS FURTHER ORDERED that:

1. Except by leave of this Court, during pendency of the receivership ordered herein, Defendants and all other persons and entities be and hereby are stayed from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, All Us Marketing LLC, any of its subsidiaries, affiliates, partnerships, assets, documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions:

a. Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations;

b. Accelerating the due date of any obligation or claimed obligation; filing, perfecting or enforcing any lien; taking or attempting to take possession, custody, or control of any asset; attempting to foreclose, forfeit, alter, or terminate any interest in any asset, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise, or setoff of any debt owing to All Us Marketing LLC that arose before the date of this Order against any claim against the All Us Marketing LLC;

c. Executing, issuing, serving, or causing the execution, issuance or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this Order or not; or

d. Doing any act or thing whatsoever to interfere with the Receiver taking custody, control, possession, or management of the assets or documents subject to this receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of the All Us Marketing LLC.

2. This Order does not stay:

a. The commencement or continuation of a criminal action or proceeding;

b. The commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or

c. The enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

3. Except as otherwise provided in this Order, all persons and entities in need of documentation from the Receiver shall in all instances first attempt to secure such information by submitting a formal written request to the Receiver, and, if such request has not been responded to within thirty (30) days of receipt by the Receiver, any such person or entity may thereafter seek an Order of this Court with regard to the relief requested.

## G. COMPENSATION OF RECEIVER

IT IS FURTHER ORDERED that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by, or in the possession or control of, or which may be received by t All Us Marketing LLC. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## H. RECEIVER'S BOND

IT IS FURTHER ORDERED that the Receiver is not required to enter a bond, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.

## VIII.

## ACCESS TO BUSINESS PREMISES

IT IS FURTHER ORDERED that All Us Marketing LLC and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, and the Receiver, shall allow Plaintiffs' representatives, agents, and assistants, as well as the All Us Marketing LLC's representatives, and the Individual Defendants themselves, reasonable access to all of All Us Marketing LLC's business premises, or any other premises where the All Us Marketing LLC conduct business or customer service operations. Such locations include, but are not limited to, 5104 N. Orange Blossom Trail #200, Orlando, Florida 32810, 8803 Futures Drive # 10, Orlando, Florida 32819, and 1200 W. State Road 434, Suites 216 and 226, Longwood, Florida 32750.

The purpose of this access shall be to inspect and copy any and all books, records, documents, accounts, and other property owned by, or in the possession of, All Us Marketing LLC or its agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access. Plaintiffs may remove materials from All Us Marketing LLC's business premises to inspect, inventory, and copy such materials. Plaintiffs shall return materials so removed within five (5) business days of completing said inventory and copying. Plaintiffs' access to the All Us Marketing LLC's documents pursuant to this Section shall not provide grounds for any Defendant to object to any subsequent request for documents served by any Plaintiff.

## IX.

## REPATRIATION OF ASSETS AND DOCUMENTS

IT IS FURTHER ORDERED that All Us Marketing LLC shall:

A. Unless previously completed in full compliance with the TRO, within three (3) business days following entry of this Order, take such steps as are necessary to repatriate to the territory of the United States of America all documents and assets that are located outside such territory and are held by or for All Us Marketing LLC or are under All Us Marketing LLC's direct or indirect control, jointly, severally, or individually;

B. Unless previously completed in full compliance with the TRO, within three (3) business days following entry of this Order, provide Plaintiffs with a full accounting of all documents and assets that are located outside of the territory of the United States of America or that have been transferred to the territory of the United States of America pursuant to Subsection A above and are held by or for All Us Marketing LLC or are under All Us Marketing LLC t's direct or indirect control, jointly, severally, or individually, including the names and addresses of any foreign or domestic financial institution or other entity holding the documents and assets, along with the account numbers and balances;

C. Hold and retain all such documents and assets and prevent any transfer, disposition, or dissipation whatsoever of any such documents or assets; and

D. Unless previously completed in full compliance with the TRO, within three (3) business days following entry of this Order, provide Plaintiffs access to All Us Marketing LLC's records and documents held by financial institutions or other entities outside the territory of the United States of America, by signing and delivering to Plaintiffs' counsel the Consent to Release of Financial Records attached to this Order as Attachment A.

## X.

## INTERFERENCE WITH REPATRIATION

IT IS FURTHER ORDERED that Defendants are hereby restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation required by the preceding Section IX of this Order, including, but not limited to:

A. Sending any statement, letter, facsimile, e-mail or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement, until such time that assets have been fully repatriated pursuant to the preceding Section of this Order; and

B. Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a Court Order, until such time as assets have been fully repatriated pursuant to the preceding Section of this Order.

## XI.

## EXPEDITED DISCOVERY

IT IS FURTHER ORDERED that pursuant to Federal Rules of Civil Procedure 30(a), 31(a), 34, and 45, and notwithstanding the provisions of Federal Rules of Civil Procedure 26(d) and (f), 30(a)(2)(A), and 31(a)(2)(A), the parties are granted leave, at any time after entry of this Order to:

A. Take the deposition of any person, whether or not a party, for the purpose of discovering the nature, location, status, and extent of the assets of All Us Marketing LLC and All Us Marketing LLC's affiliates and subsidiaries; the nature and location of documents reflecting the business transactions of All Us Marketing LLC and All Us Marketing LLC's affiliates and subsidiaries; the location of any premises where All Us Marketing LLC, directly or through any third party, conduct business operations; All Us Marketing LLC's whereabouts; and/or the applicability of any evidentiary privileges to this action; and

B. Demand the production of documents from any person, whether or not a party, relating to the nature, status, and extent of the assets of All Us Marketing LLC, and All Us Marketing LLC's affiliates and subsidiaries; the nature and location of documents reflecting the business transactions of All Us Marketing LLC, and All Us Marketing LLC's affiliates and subsidiaries; the location of any premises where All Us Marketing LLC, directly or through any third party, conduct business operations; All Us Marketing LLC's whereabouts; and/or the applicability of any evidentiary privileges to this action.

Three (3) days notice shall be deemed sufficient for any such deposition, five (5) days notice shall be deemed sufficient for the production of any such documents, and twenty-four (24) hours notice shall be deemed sufficient for the production of any such documents that are maintained or stored only as electronic data. The provisions of this Section shall apply both to parties to this case and to non-parties. The limitations and conditions set forth in Federal Rules of Civil Procedure 30(a)(2)(A)(ii) and 31(a)(2)(A)(ii) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such depositions taken pursuant to this Section shall not be counted toward any limit on the number of depositions under the Federal Rules of Civil Procedure, including those set forth in Federal Rules of Civil Procedure 30(a)(2)(A) and 31(a)(2)(A). Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made through the means described in Section XIII of this Order.

XII.

## DISTRIBUTION OF ORDER BY ALL US MARKETING LLC

IT IS FURTHER ORDERED that All Us Marketing LLC shall immediately provide a copy of this Order to each of ITS corporations, subsidiaries, affiliates, partners, divisions, sales entities, successors, assigns, members, officers, directors, employees, independent contractors, agents, servants, attorneys, spouses, representatives, and any other persons in active concert or participation with them. Within five (5) calendar days following entry of this Order, All Us Marketing LLC shall file with this Court and serve on Plaintiffs an affidavit identifying the name, title, addresses, telephone numbers, date of service, and manner of service of the persons and entities All Us Marketing LLC has served with a copy of this Order in compliance with this provision.

XIII.

## SERVICE OF THIS ORDER

IT IS FURTHER ORDERED that copies of this Order may be distributed by United States First Class Mail, overnight delivery, facsimile, electronic mail, or personally, by agents or employees of Plaintiffs, by agents or employees of the Receiver, by any law enforcement agency, or by private process server, upon any person, financial institution, or other entity that may have possession or control of any property, property right, document, or asset of All Us Marketing LLC, or that may be subject to any provision of this Order. Service upon any branch or office of any financial institution or entity shall effect service upon the entire financial institution or entity.

XIV.

## CONSUMER REPORTING AGENCIES

IT IS FURTHER ORDERED that, pursuant to Section 604 of the Fair Credit Reporting Act, 15 U.S.C. § 1681b, any consumer reporting agency may furnish a consumer or credit report concerning All Us Marketing LLC to Plaintiffs.

XV.

## CORRESPONDENCE WITH AND NOTICE TO PLAINTIFFS

IT IS FURTHER ORDERED that for purposes of this Order, all correspondence and pleadings to the Federal Trade Commission shall be addressed to:

James Davis John Hallerud Elizabeth Scott Federal Trade Commission 55 West Monroe Street, Suite 1825 Chicago, Illinois 60603 (312) 960-5634 [Telephone] (312) 960-5600 [Facsimile]

All correspondence and pleadings to the State of Florida, Office of the Attorney General, shall be addressed to:

Denise Beamer Assistant Attorney General Office of the Attorney General Consumer Protection Division 135 W. Central Boulevard, Suite 1000 Orlando, Florida 32801 (407) 245-0833 [Telephone] (407) 245-0365 [Facsimile]

XVI.

## RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes.

## ATTACHMENT A

## UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

FEDERAL TRADE COMMISSION, and STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, Plaintiffs, Civil No. 6:15 CV 1016-ORL-28GJK v. ALL US MARKETING LLC, et al., Defendants.

## CONSENT TO RELEASE OF FINANCIAL INFORMATION

I, _____, of _____ (city or province and country), do hereby direct any person, bank, savings and loan association, credit union, depository institution, finance company, commercial lending company, payment processor, payment processing entity, common carrier, customs broker, commercial mail receiving agency, mail holding and/or forwarding company, brokerage house, escrow agent, money market or mutual fund, title company, commodity trading company, or trustee, that holds, controls or maintains custody of assets, wherever located, that are owned or controlled by All Us Marketing LLC, in whole or in part, or at which All Us Marketing LLC, has an account of any kind upon which I am authorized to draw, and its officers, employees and agents, to disclose all information and deliver copies of all documents of every nature in its possession or control which relate to the said accounts to any attorney for Plaintiffs, and to give evidence relevant thereto, in the above captioned matter, *FTC and State of Florida v. All US Marketing LLC, et al.,* now pending in the United States District Court for the Middle District of Florida, and this shall be irrevocable authority for so doing. This direction is intended to apply to the laws of countries other than the United States of America which restrict or prohibit the disclosure of bank or other financial information without the consent of the holder of the account, and shall be construed as consent with respect thereto, and the same shall apply to any of the accounts for which I may be the relevant principal.

Dated: _____, 2015 _____ [Signature]
_____ [Print Name]

## Comment

Your Name

[                                                                    ]

Your Email

[                                                                    ]

Comments

[

Submit

1000 Characters Remaining

*Leagle.com reserves the right to edit or remove comments but is under no obligation to do so, or to explain individual moderation decisions.*

Copyright © 2017, Leagle, Inc

Disclaimer | Terms of Use | Privacy Statement | About Us | Contact Us

⚠ Caution
As of: August 5, 2019 8:27 PM Z

## *Mais v. Gulf Coast Collection Bureau, Inc.*

United States District Court for the Southern District of Florida

March 27, 2013, Decided; March 27, 2013, Filed

Case No. 11-61936-Civ-Scola

**Reporter**
2013 U.S. Dist. LEXIS 43485 *; 2013 WL 1283885

MARK S. MAIS et al., Plaintiffs, v. GULF COAST COLLECTION BUREAU, INC., FLORIDA UNITED RADIOLOGY, L.C., SHERIDAN ACQUISITION ASSOCIATES, P.A., and JACK W. BROWN III, Defendants.

**Subsequent History:** Summary judgment denied by, Summary judgment granted by, Partial summary judgment granted by, in part, Class certification denied by, Without prejudice, Injunction granted at, in part *Mais v. Gulf Coast Collection Bureau, Inc., 944 F. Supp. 2d 1226, 2013 U.S. Dist. LEXIS 65603 (S.D. Fla., 2013)*

Magistrate's recommendation at, Costs and fees proceeding at *Mais v. Gulf Coast Collection Bureau, Inc., 2015 U.S. Dist. LEXIS 179801 (S.D. Fla., Aug. 11, 2015)*

## Core Terms

summary judgment, corporate officer, policies, policies and practices, cell phone, allegations, collection, genuine, numbers, entitled to summary judgment, wrongful act, individually, dialing

**Counsel:** [*1] For Mark S. Mais, on behalf of himself and all others similarly situated, Plaintiff: O. Randolph Bragg, LEAD ATTORNEY, PRO HAC VICE, Horwitz Horwitz & Associates, Chicago, IL; Donald A. Yarbrough, Fort Lauderdale, FL.

For Gulf Coast Collection Bureau, Inc., Jack W. Brown, III, Defendants: Ernest Henry Kohlmyer, III., LEAD ATTORNEY, Urban Thier Federer & Chinnery, P.A., Orlando, FL; Donald A. Yarbrough, Fort Lauderdale, FL.

For Florida United Radiology, L.C., Sheridan Acquisition Associates, P.A, Defendants: Eileen Lynskey Parsons, LEAD ATTORNEY, Jason Seth Mazer, Ver Ploeg & Lumpkin, Miami, FL; Donald A. Yarbrough, Fort Lauderdale, FL.

**Judges:** ROBERT N. SCOLA, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT N. SCOLA, JR.

## Opinion

### ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the Motion for Summary Judgment [ECF No. 64], filed by Defendant Jack W. Brown III ("Brown"). For the reasons set forth below, Brown is entitled to summary judgment as to his individual liability under the TCPA.

### Introduction

In 2009, Defendant Gulf Coast Collection Bureau, Inc. ("Gulf Coast") allegedly called and left non-emergency voice messages on Plaintiff's cell phone using an automatic telephone dialing or message [*2] system, in violation of the Telephone Consumer Protection Act ("TCPA"), *47 U.S.C § 227 (b)(1)(A)(iii)*. *See* First Am. Compl. ¶ 24. Plaintiff failed to pay a medical debt to Florida United Radiology, L.C. ("Florida United") in the amount of $49.03, and the account was referred to Gulf Coast for collection purposes by Florida United's billing vendor. *See id.* ¶ 14. Gulf Coast uses automated dialing equipment to place debt collection calls. *See* Brown First Corp. Dep. at 6. There is no human involvement except for entering the telephone numbers into the system. *See id.* at 7. Once that is done, the system and computer software will automatically dial numbers and link the call back to a live operator if there is a connection. *See id.* If no one answers, the system will leave a prerecorded message.

In June 2009, Gulf Coast had implemented, or was in

2013 U.S. Dist. LEXIS 43485, *2

the process of implementing, a TCPA compliance procedure designed to distinguish between cell phone lines and residential lines. *See id.* at 41. The phone number that Gulf Coast received for Plaintiff was incorrectly identified as a home number, not a cell number. *See* Brown Second Corp. Rep. Dep. at 75-76; *see also* Brown First Corp. Dep. at 13. Gulf **[*3]** Coast's policy was to call residential and cell numbers alike, on the theory that the debtor had consented to such calls at the time of receiving medical care. *See* Brown Second Corp. Rep. Dep. at 21-22, 50, 55-56. This consent theory is allegedly based on federal agency interpretation of the TCPA. *See id.* at 55-56. If the debtor indicates that a number is a cell phone and asks not to be called on that line, Gulf Coast removes the number from the database and considers the debtor's consent withdrawn. *See id.* at 21-22.

Brown is allegedly "vice president and 20% owner of" Gulf Coast and the person who "control[led] the policies and practices of [Gulf Coast] regarding the TCPA and [who] authorized those policies and practices complained of herein." *See* First Am. Compl. ¶ 5. In deposition, Brown admitted he was the person responsible for ensuring Gulf Coast developed policies in compliance with the TCPA. *See* Brown First Corp. Dep. at 41. He was also responsible for authorizing the automated dialing system used to place debt collection calls to persons such as the Plaintiff. *See* Brown Indiv. Dep. at 5. However, Brown was not actively or personally involved in the collection of Plaintiff's **[*4]** debt, and did not personally have any role in dialing the automated system. *See* Brown Aff. ¶ 8. Aside from the allegations above, the Complaint does not name Brown in any count and does not assert any cause of action against him personally.

Brown moves for summary judgment, arguing that he cannot be held individually liable under the TCPA. *See* Mot. at 5-9. According to Brown, the undisputed facts and evidence are insufficient to justify piercing the corporate veil and finding him personally liable for conduct undertaken in his corporate capacity. *See id.* Plaintiff responds that Brown's personal liability is not based on his status as corporate officer, and is not premised on piercing the corporate veil. Instead, Plaintiff contends that individual liability is premised on Brown's "personal involvement in the violations complained of" and "his control of and authorization of the policies and practices of Gulf Coast that violate the TCPA." *See* Resp. at 2. In reply, Brown states that he did not directly participate in any wrongful conduct and that the policies he authorized complied with the relevant statutory

requirements. *See* Reply at 2-3.

## Legal Standard

Under *Federal Rule of Civil Procedure 56*, **[*5]** "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. North Carolina, 560 U.S. 330, 130 S. Ct. 2295, 2308, 176 L. Ed. 2d 1070 (2010)* (quoting *Fed. R. Civ. P. 56(a)*). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial," and "[o]nly when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. When the burden shifts, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings," but must "go beyond [them]" and affirmatively "set forth specific facts showing that there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (citations omitted); *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (citations omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1984)*.

Under *Rule 56*, the Court must **[*6]** view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue of material fact remains. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir.2004)*. "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id. at 1260*. A court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *See Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1140 (11th Cir. 2007)*.

## Legal Analysis

Initially, the Court finds that Brown is entitled to summary judgment on procedural grounds. As the

2013 U.S. Dist. LEXIS 43485, *6

Supreme Court has said, "the pleading standard *Rule 8* announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Here, the Complaint names Brown as a party defendant and alleges that he was **[*7]** "vice president and 20% owner of" Gulf Coast and the person who "control[led] the policies and practices of [Gulf Coast] regarding the TCPA and [who] authorized those policies and practices complained of herein." *See* First Am. Compl. ¶ 5. But the Complaint contains no other factual allegations against Brown and fails to assert any cause of action against him personally. "Obviously, no relief can be granted where a plaintiff does not assert any substantive causes of action against a particular defendant." *See Van Vechten v. Elenson, 2013 U.S. Dist. LEXIS 11777, 2013 WL 359750, at *10 (S.D. Fla. Jan. 29, 2013)* (Scola, J.) "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal, 556 U.S. at 678*.

Plaintiff never sought leave to amend the Complaint to fix this deficiency and the deadline to do so passed more than six months before Brown moved for summary judgment. Generally speaking, a party cannot amend its pleadings solely through argument at the summary judgment stage. *See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004)*. Furthermore, "[a] plaintiff seeking leave to amend its complaint after the deadline designated in a scheduling **[*8]** order must demonstrate 'good cause' under *Fed. R. Civ. P. 16(b)*." *Southern Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241 (11th Cir. 2009); see also Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 n. 2 (11th Cir. 1998)*. The "good cause" standard of *Rule 16(b)* precludes a belated amendment unless the deadline in the scheduling order could not have been met "despite the diligence of the party" seeking leave. *See Southern Grouts & Mortars, 575 F.3d at 1241 n.3* (citations omitted); *see also Sosa, 133 F.3d at 1418*. The Eleventh Circuit has affirmed the denial of leave to amend at this stage of the proceedings before. *See Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002); Southern Grouts & Mortars, 575 F.3d at 1242*. In failing to realize the need for amendment prior to Brown's motion for summary judgment (and, for that matter, even after), Plaintiff has not shown the kind of diligence that *Rule 16(b)* demands. Therefore, if amendment had been sought at the time of summary judgment, the Court would have denied it.

Because the Complaint fails to plead any substantive cause of action against Brown individually and otherwise contains scant factual allegations as **[*9]** to his role in the conduct complained of, the Plaintiff cannot obtain any relief from Brown as a matter of law. *See, e.g., Pate v. Ober, 2011 U.S. Dist. LEXIS 71714, 2011 WL 2632101, at *2 (M.D. Fla. July 5, 2011)* (dismissing complaint as to particular defendant because it asserted no causes of action against him); *Conrad v. The Educ. Res. Inst., 652 F. Supp. 2d 1172, 1181-82 (D. Colo. 2009)* (same); *Goines v. CIT Group, Fin., Assignor, 2012 U.S. Dist. LEXIS 60839, 2012 WL 1551712, at *3 (S.D. Tex. May 1, 2012)* (same). Accordingly, Brown is entitled to summary judgment on this procedural ground.

Alternatively, Brown is entitled to summary judgment on the merits. While several cases, including *Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)*, have found corporate officers may be individually liable under the TCPA, those decisions have all required the direct commission or authorization of wrongful acts by the corporate officer.[1] *See, e.g., Maryland v. Universal Elections, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011); Versteeg v. Bennett, Deloney & Noyes, P.C., 775 F. Supp. 2d 1316, 1321 (D. Wyo. 2011); Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC, 584 F. Supp. 2d 736, 745 (D. Md. 2008)*. Thus, under those cases, **[*10]** Brown is not liable unless he committed, directly participated in, or otherwise authorized the commission of wrongful acts within the scope of his employment as a corporate officer of Gulf

---

[1] This Court is unaware of any case from the Eleventh Circuit directly addressing whether individual corporate officers may be held personally liable under the TCPA. Absent such binding authority, the Court considers the cases cited above to the extent that they have the power to persuade. *See Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd., 240 F.3d 956, 965 (11th Cir. 2001)*. While the Court agrees that officers may be held personally liable when they "directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation," *see Am. Blastfax, 164 F. Supp. 2d at 898*, the Court does not **[*11]** necessarily endorse, or find persuasive, the way in which that legal principle has been applied by other district courts. In this Court's view, personal liability should be the exception rather than the rule and should require something more than mere control and authority over policies and practices that happen to violate the law. Some showing of intentional misconduct or gross failure to implement policies that comply should be required. To the extent that the above-cited decisions would impose liability upon a lesser showing, this Court rejects them.

Coast. See *Am. Blastfax, 164 F. Supp. 2d at 898*. In order for Brown's conduct to rise to that level here, the Court finds Plaintiff would have to show that Brown failed to take efforts to implement appropriate policies or procedures designed to comply with the TCPA, or that he authorized or personally engaged in conduct that clearly violated the TCPA.

No such facts are present in this case. While Brown is the person who allegedly "authorized the use of Gulf Coast's dialer," *see* Resp. at 4, there is no evidence of plainly violative conduct by Brown personally; indeed, there is no evidence that he had anything personally to do with the calls made to Plaintiff or any putative class member. Instead the evidence shows that he, as the person responsible, attempted to implement policies that conformed with the TCPA. For example, he stated in deposition that Gulf Coast had a procedure in place to identify which telephone numbers belonged to cell phones and that Gulf Coast made an effort to [*12] identify those numbers when accounts were forwarded for collection. Although he also stated that the company had a policy of calling cell phones and residential lines indiscriminately, that policy was based on the theory that the debtors had consented to such calls by tendering their phone numbers to their medical providers at the time of treatment.

This consent theory, even if legally mistaken, was, as Brown testified, implemented on the basis of a federal agency interpretation of the law. In this Court's view, doing something on the basis of an agency interpretation of federal law, even if incorrect, does not amount to the **direct commission, approval, or authorization of wrongful acts** so as to trigger individual liability. In addition, Brown stated that if a debtor indicated his or her cell phone had been called and requested that no further calls be made to that line, the company would deem consent withdrawn and would remove that person's number from the database. This policy or practice, authorized by Brown, also evidences an intent to comply with the TCPA.

While the Court passes no judgment here on whether the chosen policies were sufficient under the TCPA, and likewise does not [*13] comment on whether Gulf Coast is liable for any violations, the undisputed record evidence is insufficient to find Brown individually liable for personally authorizing or participating in the commission of wrongful acts. This Court is unwilling to find a corporate officer individually liable where he attempted to implement policies that complied with the statute and did not have any direct participation in the allegedly violative conduct, even if the corporation is itself liable. To hold otherwise, would countenance personal liability for corporate officials too easily. Corporate officers are generally not liable merely because the corporation has violated the law, and this Court is not going to leave the door wide open for such liability here.

## Conclusion

For the reasons explained above, the Court finds that Brown is entitled to summary judgment. According, his Motion for Summary Judgment [ECF No. 64] is **GRANTED.**

**DONE and ORDERED** in chambers at Miami, Florida on March 27, 2013.

/s/ Robert N. Scola, Jr.

**ROBERT N. SCOLA, JR.**

**UNITED STATES DISTRICT JUDGE**

End of Document

 Neutral

As of: August 5, 2019 8:28 PM Z

## *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*

United States District Court for the Southern District of Florida

June 10, 2015, Decided; June 10, 2015, Filed

Case No. 12-22330-CIV-SEITZ

**Reporter**
2015 U.S. Dist. LEXIS 75190 *; 2015 WL 3644598

PHYSICIANS HEALTHSOURCE, INC.; Plaintiff, v. DOCTOR DIABETIC SUPPLY, LLC; GEORGE T. HEISEL; DDS HOLDINGS, INC.; and SANARE, LLC; Defendants.

**Prior History:** *Physicians Health Source, Inc. v. Doctor Diabetic Supply, LLC, 2014 U.S. Dist. LEXIS 160628 (S.D. Fla., Aug. 20, 2014)*

## Core Terms

fax, advertisement, personally liable, customers, email, campaign, sending, supplies, bidding, blast

**Counsel:** **[*1]** For Physicians Healthsource, Inc., an Ohio corporation, individually and on behalf of all others similarly situated, Plaintiff: Leslie Mitchell Kroeger, Cohen Milstein Sellers & Toll, PLLC, Palm Beach Gardens, FL; Ryan Michael Kelly, Anderson Wanca, Rolling Meadows, IL.

For Doctor Diabetic Supply, LLC, a Florida limited liability company, Defendant: John Luger McManus, Kenneth Adrian Horky, Paul Bernard Ranis, LEAD ATTORNEYS, Brian Howard Koch, Greenberg Traurig, Fort Lauderdale, FL; Lawrence Dean Silverman, LEAD ATTORNEY, Akerman LLC, Miami, FL; Louis Smith, LEAD ATTORNEY, PRO HAC VICE, Greenberg Traurig LLP, Florham Park, NJ.

For DDS Holdings, Inc., Defendant: Sandra Jessica Millor, LEAD ATTORNEY, Akerman LLP, Miami, FL; Lawrence Dean Silverman, Akerman LLC, Miami, FL.

For Sanare, LLC, Defendant: Paul Bernard Ranis, LEAD ATTORNEY, Brian Howard Koch, John Luger McManus, Greenberg Traurig, Fort Lauderdale, FL; Lawrence Dean Silverman, Akerman LLC, Miami, FL.

For George T. Heisel, Defendant: Lawrence Dean Silverman, LEAD ATTORNEY, Akerman LLC, Miami, FL; Sandra Jessica Millor, LEAD ATTORNEY, Akerman LLP, Miami, FL.

**Judges:** PATRICIA A. SEITZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** PATRICIA A. SEITZ

## Opinion

FINDINGS **[*2]** OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial on the remaining issue in this case: whether Defendant George T. Heisel is personally liable to the class, under the Telephone Consumers Protection Act ("TCPA"), for sending the July 2008 Fax (Ex. 1).[1] The Court has considered all of the evidence presented. While the Plaintiff was able to survive summary judgment, it has not met its burden to hold Heisel personally liable under the law. The Court therefore need not address whether the 2008 Fax constituted an "advertisement."

### A. FINDINGS OF FACT

1) Defendant Doctor Diabetic Supply, LLC ("DDS") was a nationwide mail-order distributor of diabetic testing supplies. Defendant George T. Heisel founded DDS in 2001 and remained its CEO until 2011. His stepbrother, Chris Mehringer, was President **[*3]** of DDS until the end of 2007, when he left the company.[2] In the spring of

---

[1] On December 23, 2014, the Court certified a class of recipients of the July 2008 Fax. [DE-201.] Before trial, Defendant Doctor Diabetic Supply, LLC ("DDS") stipulated to a consent judgment [DE-235], some claims (including all those against Defendant Sanare, LLC) were dismissed via summary judgment [DE-215], and Plaintiff voluntarily dismissed all other remaining claims [DE-232].

[2] Marketing Manager Nino Serafini and Vice President of Operations Ade Batista also left the company around the end

2015 U.S. Dist. LEXIS 75190, *3

2008, DDS had approximately 300 employees and at least six senior officers, three of whom ran day-to-day operations: Vice President of Sales Chris Halenar, Billing Director Doug Mee, and Technical Liaison Stuart Meltzer.

2) The evidence was unrefuted that Heisel's management style was to focus on the big picture and to hire good people who could be trusted with the details. He was the company's main contact with outside counsel, Fulbright & Jaworski, because this helped him control the firm's high legal fees.

3) Almost all of DDS's customers were Medicare patients, and DDS reached them through direct consumer marketing on websites and other media. Potential customers would see the services available and contact DDS. If a potential customer contacted DDS, DDS would contact the customer's doctor, usually by fax. DDS needed a prescription before it could supply a customer, and doctors would often send prescriptions to DDS via fax. DDS did not market to doctors, via fax or otherwise.

4) In 2007, pursuant [*4] to the Medicare Modernization Act of 2003, the Center for Medicare and Medicaid Services ("CMS") adopted a new reimbursement policy for certain types of medical supplies and set up a competitive bidding program in ten regions called Metropolitan Statistical Areas ("MSAs"). Once the new policy went into effect on July 1, 2008, Medicare would only reimburse customers in those ten MSAs for supplies purchased from providers that had submitted successful bids and with whom CMS had a contract. (*See* Ex. C.)

5) DDS submitted bids and was selected as an approved provider for diabetic testing supplies in all ten MSAs. However, reimbursements rates under the new program were significantly lower than under earlier Medicare fee schedules. Heisel testified that they were even lower than DDS's costs. DDS's strategy was to keep its existing patients in the ten MSAs and hope that the new policy would "blow up."[3]

6) Heisel testified that Medicare informed its patients about the new policy but did not inform doctors. Instead, it asked providers to communicate with doctors.

7) In early 2008, Claudio Araujo, [*5] Vice-President of Marketing and Technology, worked with Heisel to prepare a press release and a letter announcing the new Medicare reimbursement policy as well as DDS's selection as an approved provider. On April 29, 2008, Araujo emailed drafts of these documents to Heisel and requested that he ask outside legal counsel "whether this would be acceptable." (Ex. 3; *see also* Exs. 5, 6.) The emailed draft letter (the "April 2008 Letter") was an early version of the fax that was sent to Plaintiff and others in July 2008 (the "July 2008 Fax"). (*Compare* Ex. 1 *with* Ex. 5.) There was no indication in the text of the April 2008 Letter that it was intended to be sent by fax.

8) DDS's legal counsel approved the content of both documents. Heisel's forwarded this approval to Araujo and authorized their use. When asked at trial whether legal counsel knew that the April 2008 Letter would be faxed, Heisel responded that he did not think so because he himself thought it would be mailed. This was the only testimony about whether the April 2008 Letter was vetted, by counsel or otherwise, for compliance with the TCPA.

9) In June 2008, Stuart Meltzer created a list of fax numbers of physicians in the ten [*6] MSAs who were in DDS's database because they had previously prescribed DDS's products (the "CBIC List"). On June 27, 2008, Meltzer emailed DDS's IT department, attaching the 2008 Fax and the CBIC List, and asked it to send the July 2008 Fax to each number on the list. Prekumar Balwani, a computer programmer, was responsible for sending the July 2008 Fax to the CBIC list.

10) Beginning on July 1, 2008, DDS successfully sent the July 2008 Fax (Ex. 1) to 4,324 recipients, including Plaintiff. [DE-239 @@ 28-50.] The fax account used to send the July 2008 Fax belonged to "George T. Heisel," which name Heisel shares with his father. The fax account lists an address in Jupiter, Florida and several email addresses which belong to Heisel's father. According to Heisel, his father's credit card was used for certain accounts because his father wanted the credit card rewards.

11) The July 2008 Fax differed in some ways from the April 2008 Letter that Araujo had sent to Heisel. For example, the July 2008 Fax is more eye-catching, with a bolded and underlined headline telling the reader to "ACT NOW" and some bold paragraphs, whereas the April 2008 Letter looks like a regular business letter, with a [*7] "re:" subject line and no bold print. The April

---

of 2007.

[3] In fact, Congress cancelled the results of the first round of bidding and ordered CMS to start over. See *42 U.S.C. § 1395w-3(a)(1)(D)*.

2015 U.S. Dist. LEXIS 75190, *7

2008 Letter directed the reader to several specific articles about the competitive bidding program, whereas the 2008 Fax only had a general link to the main Medicare website. However, neither the April 2008 Letter nor the July 2008 Fax included an opt-out notice. (*Compare* Ex. 1 *with* Ex. 5.)

12) There was no evidence explaining the metamorphosis of the April 2008 Letter into the July 2008 Fax or how it was decided to send the letter by fax. Araujo, who drafted the April 2008 Letter and who left DDS in 2012, could not recall how those changes came about.

13) The only evidence suggesting that DDS, with Heisel's knowledge, had previously used a "blast fax" campaign was a May 2008 email from Cathy Pereira, National Sales Manager for Homediagnostics, to DDS Billing Director Doug Mee, copying Heisel. In that email, Pereira asked if DDS had received "the corrected contract as well as the artwork for the TRUEtrack meter for your fax blast campaign." Mee responded that the contracts had been signed. (Ex. 9.) However, the unrefuted testimony was that no fax blast campaign for the TRUEtrack meter ever took place. Heisel testified that DDS sometimes [*8] bought supplies from vendors like Homediagnostics, and vendors sometimes suggested how to market those supplies, but DDS never contracted to carry out any marketing campaigns by fax.

14) Thus, there is no evidence that Heisel was personally involved in sending the July 2008 Fax as a fax, other than his sending the April 2008 Letter to counsel and authorizing that it be sent on behalf of DDS as part of a plan to retain existing customers and inform their doctors of a change in Medicare.

## B. CONCLUSIONS OF LAW

The Telephone Consumer Protection Act (the "TCPA") makes it "unlawful for any person . . . to send any . . . unsolicited advertisement" to a fax machine unless certain requirements are met. *47 U.S.C. § 227(b)(1)(C)*. FCC regulations further require that any advertisement sent by fax, whether solicited or unsolicited, must include an opt-out notice. *47 C.F.R. § 64.1200(a)(4)(iv)*. If these requirements are not met, the "sender" of the advertisement is liable. "Sender" means "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." *47 C.F.R. § 64.1200(f)(1); see also*

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1257 (11th Cir. 2015)* (upholding this definition).

A corporate officer "may be personally liable under the [*9] TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved." *Texas v. Am. Blastfax, Inc., 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)*. However, in every known case holding a corporate officer personally liable under the TCPA, the officer had either directly committed or knowingly authorized the corporation's wrongful acts. For example, in *American Blastfax*, the individual defendants were the only two officers of a company whose sole business was to send fax advertisements for third parties. Moreover, despite being told repeatedly that their conduct was violating the law, both defendants persisted in sending advertisements up until the day before trial, when they shut down the company and filed for personal bankruptcy. The court found them liable because "to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct." *Id.; see also Jackson Five Star Catering, Inc. v. Beason, No. 10-10010, 2013 U.S. Dist. LEXIS 159985, 2013 WL 5966340, at *4 (E.D. Mich. Nov. 8, 2013)* (officer "personally participated in the payment of and authorization for the fax ads"); *Covington & Burling v. Int'l Mktg. & Research, Inc., No. CIV.A. 01-0004360, 2003 D.C. Super. LEXIS 29, 2003 WL 21384825, at *7 [*10] (D.C. Super. Apr. 17, 2003)* (individual defendants were the "only officers of Fax.Com" and were involved "with all aspects of Fax.Com from marketing to supervising employees").

The same principle applies in other areas of the law. *See, e.g., S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers, 756 F.2d 801, 811 (11th Cir. 1985)* (a corporate officer is personally liable for copyright infringement if he either "personally participates in [the infringing] activity" or "has the ability to supervise infringing activity and has a financial interest" in it); *F.T.C. v. World Media Brokers, 415 F.3d 758, 764 (7th Cir. 2005)* (individuals were personally liable because they had knowledge of, and control over, the corporation's deceptive practices); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 734 (9th Cir. 1999)* (officer was personally liable because he himself made the statement that violated the Lanham Act); *United States v. Pollution Abatement Servs. of Oswego, Inc., 763 F.2d 133, 135 (2d Cir. 1985)* (holding liable "corporate officers who are personally involved in

2015 U.S. Dist. LEXIS 75190, *10

or directly responsible for statutorily proscribed activity"); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 517 F.2d 1141, 1146 (4th Cir. 1975)* (directors are "personally liable when they intentionally cause a corporation" to discriminate on the basis of race).

Given the law and the evidence presented, the Court cannot hold Heisel personally liable. This is not a case involving an officer who insisted that his company keep sending mass fax blasts. Heisel approved the April 2008 Letter that became the July 2008 Fax, but the April 2008 Letter looks like an informational letter to be mailed, whereas the July 2008 Fax looks [*11] more like a promotional fax. While it is unclear why the content changed or how it was decided to send the letter by fax, there is no evidence that Heisel was involved in either of those changes. And even assuming the July 2008 Fax violated the TCPA, the violation consisted largely of a failure to follow certain technical requirements, such as including an opt-out notice. It would be inconsistent with his management style for Heisel to have been personally involved in technical compliance issues, and there is no evidence of any departure from that general practice.

Nor did Heisel personally authorize that the letter be sent as a fax. Plaintiff argues that Heisel was personally involved in paying for the faxes because Heisel's name was on the fax account. However, the unrebutted evidence was that DDS's fax bills were charged to his father's credit card, not to his. And even if Heisel paid for the fax account, this would not suggest that Heisel specifically authorized sending the July 2008 Fax as a fax because DDS used faxes for routine communication. *Compare with Beason, 2013 U.S. Dist. LEXIS 159985, 2013 WL 5966340, at *4* (officer wrote a check for "5,000 fax ads").

Plaintiff maintains that Heisel can be personally liable because he authorized [*12] that the April 2008 Letter be sent and failed to restrict the manner in which it would be sent, even though he knew that DDS had previously used faxes for advertising. As evidence of Heisel's knowledge, Plaintiff relies on the May 2008 email referencing "the corrected contract as well as the artwork for the TRUEtrack meter for your fax blast campaign," on which Heisel was copied. However, it became clear at trial that no fax blast campaign ever took place. In fact, the July 2008 Fax was the first mass fax that DDS ever sent. In light of this fact, the most natural reading of the email is that the contract was to buy the TRUEtrack meter from Homediagnostics, not to conduct a fax campaign. Moreover, the unrefuted

evidence was that DDS's marketing strategy had never involved advertising directly to doctors or otherwise using fax advertising. DDS's customers were patients, not doctors, and its plan was to maintain its existing customers pending the "blow up" of the competitive bidding program. Therefore, this was one stray email, and it was not sufficient to show that Heisel knew that DDS was using fax advertising or to put him on notice that the April 2008 Letter might end up going out [*13] as a fax.

Therefore, based on the evidence presented, the Court concludes that Heisel neither knew, suspected, or should have known that the April 2008 Letter would end up going out as a fax. In light of the conclusion that Heisel is not personally liable, the Court will not address whether the July 2008 Fax constituted an "advertisement" under the TCPA. Accordingly, it is hereby

ORDERED that

1) This case is CLOSED.

2) Any pending motions not otherwise ruled upon are DENIED AS MOOT.

3) Final judgment in favor of Heisel and against Plaintiff will be entered separately. By **June 30, 2015**, Plaintiff's counsel shall certify that it has notified the class of the judgment.

DONE AND ORDERED in Miami, Florida, this, 10th day of June, 2015.

/s/ Patricia A. Seitz

PATRICIA A. SEITZ

UNITED STATES DISTRICT JUDGE

FINAL JUDGMENT

Pursuant to the Order Granting Summary Judgment In Part [DE-215] and the Findings of Fact and Conclusions of Law [DE-248], final judgment on the sole remaining claim is

ENTERED as follows:

On Count I (TCPA) of the Second Amended Complaint [DE-41], against Plaintiff and in favor of Defendants George T. Heisel and Sanare, LLC. Plaintiff shall recover nothing and the claim is dismissed on [*14] the

merits.

DONE AND ORDERED in Miami, Florida, this 10th day
of June, 2015.

/s/ Patricia A. Seitz

PATRICIA A. SEITZ

UNITED STATES DISTRICT JUDGE

---

End of Document

.

JOANNA LIAPES

⚠ Caution
As of: August 5, 2019 8:29 PM Z

# *Savanna Group, Inc. v. Trynex, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

September 3, 2013, Decided; September 3, 2013, Filed

Case No. 10 C 7995

**Reporter**
2013 U.S. Dist. LEXIS 125090 *; 2013 WL 4734004

THE SAVANNA GROUP, INC., individually and as the representative of a class of similarly-situated persons, Plaintiff, v. TRYNEX, INC. and JAMES TRUAN, Defendants.

**Prior History:** *Savanna Group v. Truan, 2013 U.S. Dist. LEXIS 33462 (N.D. Ill., Feb. 20, 2013)*

## Core Terms

fax, advertisement, summary judgment, entity, unsolicited, vicarious liability, parties, sender, violations, material fact, facsimile, agency principles, seller, regulations, manifested, services, damages, carbon, issues, fax number, customer, notation, promoted, assent, cases, summary judgment motion, light most favorable, agency relationship, genuine dispute, genuine issue

**Counsel:** [*1] For The Savanna Group, Inc., an Illinois corporation, individually and as the representative of a class of similarly-situated persons, Plaintiff: Phillip A. Bock, LEAD ATTORNEY, James Michael Smith, Jonathan B. Piper, Phillip James Bullimore, Tod Allen Lewis, Bock & Hatch, LLC, Chicago, IL; Brian J Wanca, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL.

For James Truan, Trynex, Inc., Defendants: Laura Milnichuk, Litchfield Cavo, LLP, Chicago, IL; Stephanie Wing Tipton, Litchfield Cavo, Chicago, IL.

**Judges:** AMY J. ST. EVE, United States District Court Judge.

**Opinion by:** AMY J. ST. EVE

## Opinion

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Savanna Group on behalf of a class of similarly situated individuals brings a class action against Defendants Trynex, Inc. and James Truan for alleged violations of the Telephone Consumer Protection Act pursuant to *47 U.S.C. § 227*. Before the Court are the parties' cross-motions for summary judgment. For the following reasons, the Court denies Plaintiff's Motion and grants in part and denies in part Defendants' Motion.

### BACKGROUND

Plaintiff, the Savanna Group, Inc. ("Savanna"), is an Illinois corporation. (Defs. 56.1 ¶ 1.) Defendant Trynex, Inc. is a [*2] Michigan corporation with its principal place of business in Warren, Michigan. (Defs. 56.1 ¶ 2.) Trynex sells salt-spreaders and other snow and ice removal equipment to distributors and dealers. (Defs. 56.1 ¶ 13.) Defendant James Truan is the vice president of Trynex and the head of marketing. (Defs. 56.1 ¶¶ 3, 29; Pls. Resp. to Defs. 56.1 ¶¶ 3,29.) Trynex markets its equipment through industry publications and trade shows. Trynex also uses "SnowEx Alerts." (Defs. 56.1 ¶ 12.) Prior to December of 2006, Trynex sent out SnowEx Alerts using its in-house fax machine. (Defs. 56.1 ¶ 16; Pls. Resp. to Defs. 56.1 ¶ 16.)

In December of 2006, Barry Truan—a Trynex customer service representative and James Truan's then 21-year old son—hired Business to Business Solutions ("B2B") to send out a "SnowEx Alert" fax promoting Trynex's extended warranty program. (Defs. 56.1 ¶¶ 17, 19; Pls. Resp. to Defs. 56.1 ¶¶ 17,19.) B2B was a fax advertising business operated by Caroline Abraham in conjunction with a Romanian company, Macaw. (Pls. 56.1 ¶ 9;). [1] B2B acted as Macaw's agent in the United

---

[1] In their Response to Plaintiff's Rule 56.1 statement,

2013 U.S. Dist. LEXIS 125090, *2

States and "quarterbacked" its faxing operation from Brooklyn, New York. (Pls. 56.1 ¶ 10.) Generally, B2B would assist [*3] a customer in drafting a fax advertisement and then send it after receiving the customer's approval. (Pls. 56.1 ¶ 12; Defs. Resp. ¶ 12.) B2B obtained its list of fax recipients by culling a list of targets from a database purchased by InfoUSA. (Pls. 56.1 ¶ 13; Defs. Resp. ¶ 13.) B2B did not contact any of the companies in the database to request express permission or invitation to receive the faxes prior to sending them. (*Id.* ¶ 13.) In coordinating the faxing, Caroline Abraham never spoke with Barry Truan or anyone from Trynex. (Pls. 56.1 ¶ 92.) [2]

Barry Truan paid B2B $508 by check from Trynex's petty cash account for the faxing services. As an individual who routinely signs petty cash checks at Trynex, James Truan signed the check. (Defs. 56.1 ¶ 39.) The "Memo" section of the carbon back of the check contained the hand-written notes "Blast Fax" and "Client # T120701." (Pls. 56.1 ¶ 18; Defs. Resp. to Pls. 56.1 ¶ 18.) Barry Truan then faxed a copy of the check to B2B.

The fax Trynex hired B2B to send ("Trynex fax") stated the following:

"BEST BUILT . . . BEST BACKED! YEAR-END OFFER! 50% OFF ON EXTENDED WARRANTY FOR ALL OF OUR SPREADERS PURCHASED IN DECEMBER, 2006, AND JANUARY, 2007! For a limited time we are offering 50% [*5] OFF on our extended warranty — a total of 5 years of coverage for HALF THE PRICE!!! Call 1-800-SALTERS for

---

Defendants deny several asserted facts on the grounds that Plaintiff failed to attach an Ex. A to its Rule 56.1 statement. Within its discretion to enforce the Local Rules, the Court understands "Ex. A" to refer to Caroline Abraham's deposition, which Plaintiff attached as Ex. 2. (R. 202-1, Ex. 2.)

[2] The facts surrounding Barry Truan's interaction with B2B or the "Marketing Research Center," an alias for B2B, remain unclear. In his May 2, 2011 deposition Barry Truan testified that after receiving information from a friend about the Marketing Research Center, he contacted Kevin Wilson and [*4] "Philip." (R. 199-7, Ex. G., Dep. Tr. 8:11-12.) The Marketing Research Center then "deferred [him] to a local rep" for the area, which was one of those two individuals. (*Id.* at 9:12-15; 11-13.16.) Mr. Truan could not recall how many conversations he had with the Marketing Research Center prior to the deferral. (*Id.* at 11:21.) It is clear from Ms. Abraham's deposition that she communicated with Kevin Wilson, a sales agent for Macaw, regarding the faxing at issue. (R. 199, 10, Ex. J., Dep. Tr. 92:12-17; 78:22-25.)

more information."
(Defs. 56.1 ¶ 22, Decl. A, #B2B000021.)

In the actual fax transmission, B2B attached its own 2-page fax advertisement to the SnowEx Alert without Trynex's knowledge or authorization. (Defs. 56.1 ¶¶ 50-51; Pls. 56.1 ¶¶ 50-51.) Based upon information recovered from the hard-drive of a B2B computer, B2B sent the Trynex fax to a total of 12,163 fax numbers, of which 8,199 were "successful error-free received fax transmissions." (Pls. 56.1 ¶ 38.) Records indicate that B2B successfully sent the fax to Savanna Group's fax number. (Pls. 56.1 ¶ 39.) The B2B hard-drive contained a file named "T120701_SnowexTheirsCombo061219a-barry.tif." (Pls. 56.1 ¶ 40.)

Plaintiff brought a class action on behalf of itself and other entities sent the fax against Trynex and James Truan (among others) in Illinois Circuit Court alleging violations of the Telephone Consumer Protection Act. *See 47 U.S.C. § 227.* On December 16, 2010, Defendants removed the case to federal court on the basis of federal question jurisdiction under *28 U.S.C. § 1331.* (R. 1.) Plaintiff seeks $500 in statutory damages [*6] per violation, as well treble damages. (R. 161; R. 201.)

On February 20, 2013, the Court certified a class action pursuant to *Federal Rule of Civil Procedure Rule 23* composed of the following class of individuals:

All persons who were successfully sent a facsimile on December 19, 2006 or December 20, 2006, from "SnowEx . . . Leaders in Ice Control" promoting the "best built . . . best backed" salt spreaders, offering "50% off on extended warranty for all of our spreaders purchased in December, 2006 and January, 2007," and instructing interested recipients to "Call 1-800-Salters for more information."
(R. 176, R. 156.)
Both parties have moved for summary judgment.

## LEGAL STANDARD

### I. Northern District Illinois — Local Rule 56.1

*Local Rule 56.1* "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson, 634 F.3d 895, 899*

2013 U.S. Dist. LEXIS 125090, *6

*(7th Cir. 2011)* (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the **[\*7]** moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc., 559 F.3d 625, 632 (7th Cir. 2009)*. "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing *N.D. Ill. R. 56.1(b)(3)(B)*). Local Rule 56.1(b)(3)(C) further requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment because the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response. *See Ciomber v. Coop. Plus, Inc., 527 F.3d 635, 643-44 (7th Cir. 2008)*; *Cichon v. Exelon Generation Co., L.L.C., 401 F.3d 803, 809 (7th Cir. 2005)*.

As the Seventh Circuit has explained, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties **[\*8]** to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc., 686 F.3d 394, 398 (7th Cir. 2012)*. As such, Local Rule 56.1 statements should identify the relevant admissible evidence supporting the material facts, but should not make factual or legal arguments. *See Cady v. Sheahan, 467 F.3d 1057, 1060 (7th Cir. 2006)* ("statement of material facts did [ ] not comply with *Rule 56.1* as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Moreover, the requirements for responses under *Local Rule 56.1* are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524, 528 (7th Cir. 2000)*. The Court may also disregard statements and responses that do not properly cite to the record. *See Cady, 467 F.3d at 1060*; *Cichon, 401 F.3d at 809-10*. Finally, the Court has broad discretion to enforce *Local Rule 56.1*. *See Benuzzi v. Bd. of Educ. of City of Chicago, 647 F.3d 652, 655 (7th Cir. 2011)*.

## II. *Federal Rule of Civil Procedure 56*

Summary judgment is appropriate "if the movant shows that there **[\*9]** is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. In deciding a summary judgment motion, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*. The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson, 477 U.S. at 255* (quotation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are **[\*10]** the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704-05 (7th Cir. 2011)* (internal citations omitted); *see also Anderson, 477 U.S. at 255* ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .").

## ANALYSIS

In their Motions, the parties mainly contest the issue of Trynex and James Truan's vicarious liability for the actions of B2B. The Court will address this issue in the posture of the arguments raised in Defendants' Motion. In determining whether genuine issues of fact exist, however, the Court will consider the evidence in the light most favorable to the relevant non-moving party.

## I. Trynex

Defendants argue that Trynex is entitled to summary judgment on two grounds: (1) B2B did not send the fax "on behalf" of Trynex; (2) Trynex is not vicariously liable for the actions of B2B under the agency principles recently set forth in *In the Matter of the Joint Petition Filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6587 (2013)* ("*Dish Network*"). Before considering whether issues of fact preclude summary judgment, the Court must clarify the applicable standard **[\*11]** governing this issue.

JOANNA LIAPES

## A. TCPA and Vicarious Liability

*Section 227(b)(1)(C) of the TCPA* provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless," among other conditions, "the unsolicited advertisement is from a sender with an established business relationship with the recipient." *47 U.S.C. § 227(b)(1)(C)*. *Section 227(b)(3)* provides a private right of action for violations of *47 U.S.C. § 227(b)*. See id. *§ 227(b)(3)*.

The Federal Communications Commission (FCC) has authority to promulgate regulations implementing the TCPA. See *47 U.S.C. § 227(b)(2)*; *Addison Auto., Inc. v. RTC Grp., Inc., No. 12 C 9869, 2013 U.S. Dist. LEXIS 99448, 2013 WL 3771423, at *4 (N.D. Ill. July 16, 2013)*. An FCC regulation defines a "sender" for purposes of the ban on the transmission of unsolicited faxes in the regulations as "the [*12] person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." *47 C.F.R. § 64.1200(f)(10)*. The FCC has clarified that—as between the entity on whose behalf a message is sent and "service providers" or "fax broadcasters" that disseminate messages for that entity—the "entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 10 FCC Rcd. 12391, 12407-08, ¶¶ 34-35 (July 26, 1995); see also In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 21 FCC Rcd. 3787, 3808, ¶ 39 (April 5, 2006)* ("We take this opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent.") (with respect to rules addressing responsibility for compliance with opt-out notice requirements).

As a threshold issue, the parties debate which standard of liability applies to [*13] violations for sending unsolicited faxes through the use of third parties. Plaintiff argues primarily that the "sender" standard set forth in *47 C.F.R. § 64.1200(f)(10)* governs the issue. Under this standard, Plaintiff apparently suggests that Trynex would be liable as the "sender" of the fax as the

"person or entity . . . whose goods or services are advertised or promoted in the unsolicited advertisement." *See 47 C.F.R. § 64.1200(f)(10)*. Defendants contend that the general agency vicarious liability principles set forth in the FCC's May 19, 2013 *Dish Network* declaratory ruling determine Trynex's liability. Under the agency standard, Defendants argue that Trynex is entitled to summary judgment because Trynex lacked an agency relationship with B2B. Plaintiff further contends that even if agency principles apply, there is no genuine factual dispute that B2B acted with sufficient apparent authority from Trynex to give rise to liability.

Prior to the *Dish Network* ruling, the relationship between agency principles and the "sender" definition in *47 C.F.R. § 64.1200(f)(10)* was uncertain. Defendants cite several cases that have applied vicarious liability agency principles to violations of [*14] different provisions of the TCPA. *See, e.g., Thomas v. Taco Bell Corp., 879 F. Supp. 2d 1079 (C.D. Cal. 2012.); Mey v. Pinnacle Sec., LLC, No. 5:11 CV 47, 2012 U.S. Dist. LEXIS 129267, 2012 WL 4009718, *4-5 (N.D.W.Va. Sept. 13, 2012)*. Nonetheless, as at least one district court in this District has recognized, the application of the heightened standard of agency liability to the fax context does not square entirely with *47 C.F.R. § 64.1200(f)(10)*. *See Addison Automatics, 2013 U.S. Dist. LEXIS 99448, 2013 WL 3771423, at *4* ("The cases relied on by the Defendants that hold that Plaintiff must establish the existence of an agency relationship in order to hold the Defendants vicariously liable are unpersuasive. None of these cases appears to have considered the rule promulgated by the FCC that defines 'senders' as the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement.").

In *Dish Network*, the FCC addressed the questions of whether a "seller"—who does not generally "initiate" calls within the meaning of the TCPA—may nevertheless be vicariously liable under federal common law agency principles for violations of either *§ 227(b)* or *§ 227(c)* committed by third-party telemarketers. The FCC concluded that [*15] "[w]hile *section 227(b)* does not contain a provision that specifically mandates or prohibits vicarious liability . . . the prohibitions contained in *section 227(b)* incorporate the federal common law of agency and . . . such vicarious liability principles reasonably advance the goals of the TCPA." *28 F.C.C.R. at 6587*.

Both parties implicitly acknowledge that *Dish Network*

2013 U.S. Dist. LEXIS 125090, *15

applies to this case. Nonetheless, further explanation is required on this point. Under the Hobbs Act, the Court must apply a final FCC order if it governs the matter at issue. See *28 U.S.C. § 2342(1)*; *CE Design, Ltd. v. Prism Bus. Media, Inc., 606 F.3d 443, 446 (7th Cir. 2010)* ("[T]he Hobbs Act prevents the district court from reviewing the validity of FCC regulations.") Although *Dish Network* spoke of the availability of vicarious liability agency principles for violations of the "prohibitions" of *§ 227(b)* —which include the prohibition on sending unsolicited faxes—it specifically addressed the status of "sellers" within the telemarketing context, not "senders" within the faxing context. The FCC regulations define these terms separately. Compare *47 C.F.R. § 64.1200 (f)(9)* ("The term seller means the person or entity **[*16]** on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."), with *47 C.F.R. § 64.1200 (f)(10)* ("The term sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."). Given the substantial similarity between the definitions of "seller" and "sender" and the broad language of the ruling concerning violations of *§ 227(b)*, the ruling is controlling in this case.

## B. Issues of Material Fact

Applying the *Dish Network* agency standard, Trynex is not entitled to summary judgment. The federal common law of agency as described in *Dish Network* is in accord with the Restatement. See *Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1064 (7th Cir. 2000)*. The Restatement (Third) of Agency defines agency as a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's **[*17]** control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) Agency § 1.01*. The agent's authority to act may be either actual or apparent. See *Restatement (Third) Agency § 2.01*; See *Dish Network, 28 F.C.C.R. at 6586*. "An essential element of agency is the principal's right to control the agent's actions." *Restatement (Third) of Agency § 1.01, cmt. f(1) (2006)*. In particular, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." See *id.*

In addition, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal."102 *Dish Network, 28 F.C.C.R. at 6586*. In *Dish Network*, the FCC noted that broader theories of agency liability such as ratification may be available in particular cases. See *28 F.C.C.R. at 6586-87* ("For example, a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits."). Ratification **[*18]** occurs "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *Id.*

The existence and scope of an agency relationship between Trynex [3] and B2B turns on numerous disputed issues of fact inappropriate for resolution at summary judgment. Specifically, issues of fact remain as to whether Trynex manifested assent for B2B to act as its agent with respect to the allegedly unsolicited faxes. Barry Truan testified that to his knowledge Trynex provided a list of numbers to B2B for its registered dealers and users. (Dep. Tr. 37: 5-11.) Plaintiff, however, presents evidence of a document from B2B stating that B2B would send the ad to "all the fax numbers we have for snow removal and landscaping companies" and that "[y]our price is $508 for us transmitting approximately 12,000 ads to all the fax numbers we have for snow removal and landscaping companies." **[*19]** (Pls.' 56.1 ¶ 16.) Defendants have not demonstrated in the record the number of fax numbers allegedly contained in the list provided by Trynex to B2B. Viewing this evidence in the light most favorable to Plaintiff, a factual question remains as to the scope of the agency relationship.

Defendants further contend that the fact that Trynex only paid $508 demonstrates that Trynex did not pay for "number rental," because number rental is listed as a separate charge on the pricing sheet sent to Barry Truan. (See R. 199-11, Ex. K.) But whether or not Trynex paid for "number rental" is not dispositive of whether or not it manifested assent for B2B to act as its agent, or whether the third-party recipients' belief that

---

[3] Defendants further assert that Trynex cannot be held liable for the acts of Barry Truan in connection with hiring B2B because Barry Truan was not authorized to act on behalf of Trynex in this capacity. This is a distinct issue from the other vicarious liability issues that the parties have not briefed. Regardless, the record presents factual disputes on this question.

B2B acted as an agent of Trynex was reasonable. Rather, this determination turns in part on the factors identified [*20] in the *Dish Network* ruling as indicative of apparent authority, such as the "ability by the outside sales entity to enter consumer information into the seller's sales or customer systems," "[its] authority to use the seller's trade name, trademark and service mark," and whether "the seller approved, wrote or reviewed the outside entity's . . . [materials]." [4] *See 28 F.C.C.R. at 6592*. Caroline Abraham further averred in her March 28, 2010 declaration that B2B would draft an advertisement and then receive customer approval for it prior to transmission. (Pls.' 56.1 ¶ 12, Ex. E., ¶ 6.) Here, there is evidence of the notation of "blast fax" on the carbon back of the check sent to B2B. This is sufficient to create a genuine issue of fact as to whether B2B acted with the apparent authority of Trynex.

Viewing this evidence in the [*21] light most favorable to Plaintiff, —coupled with the addition of B2B's own advertisement to the Trynex fax—there is a factual question that precludes summary judgment for Plaintiff as to whether B2B acted within the scope of its authority under any agency relationship. *See Bridgeview Health Care Ctr. Ltd. v. Clark, 09 C 5601, 2013 U.S. Dist. LEXIS 37310, 2013 WL 1154206 (N.D. Ill. Mar. 19, 2013)* (material factual dispute on whether B2B exceeded authority by sending faxes outside certain authorized geographical range); *Creative Montessori v. Ashford Gear LLC*, No. 09 C 3963, Doc. # 157 ("In the instant case, the key fact on which defendant bases its motion, that it instructed B2B to send facsimiles only to a list of customers provided by defendant, remains in dispute.).

## II. James Truan

The parties dispute James Truan's liability under the same theories as they applied to Trynex. Because James Truan is an officer of a corporation, however, he presents a different case with respect to vicarious liability. Absent an expression of contrary intent, "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to

[*22] incorporate those rules." *Meyer v. Holley, 537 U.S. 280, 285, 123 S. Ct. 824, 828-29, 154 L. Ed. 2d 753 (2003)*. Under the general background principles of vicarious liability, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *See id.* "A corporate employee typically acts on behalf of the corporation, not its owner or officer." *Id. at 829*.

Viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of fact as to whether James Truan may be vicariously liable as either the "sender" of the faxes within the meaning of *47 C.F.R. 64.1200(f)(10)* or under agency principles. It is undisputed that the check that James Truan signed was from "Trynex International." (Pls. 56.1 ¶ 17, Ex. A, Ex. C.) Moreover, Plaintiff has failed to present any evidence disputing that Barry Truan "never explained check to James Truan" and that Barry Truan "placed the notation 'Blast Fax' on the carbon back after James Truan signed the check drafted to Business To Business." (R. [*23] 199-8, Decl. Barry Truan ¶¶ 4,6.) Although Plaintiff asserts that because James Truan was the head of marketing for Trynex, "it makes perfect sense that [he] would approve a fax marketing campaign," this speculation is not sufficient to survive summary judgment. Similarly, while Plaintiff argues there is a genuine issue of material fact as to whether James Truan saw the notations on the carbon back of the check, Plaintiff presents no evidence for this assertion, other than that he was the head of marketing. *See* Pls. Resp. to Defs. 56.1 ¶ 28. Indeed, premising Truan's liability solely on his status as the head of marketing would run afoul of the principle that a corporate officer may not be liable for corporate acts based purely on his or her status in the corporation. *See Texas v. Am. Blastfax, Inc., 164 F. Supp. 2d 892, 897 (W.D. Tex. 2001)*.

Taking all inferences in favor of Plaintiff, the same goes for any agency relationship between James Truan and B2B. Specifically, Plaintiffs have failed to put forth sufficient evidence that either James Truan manifested assent to B2B to act on his personal behalf and subject to his control or that B2B manifested assent or otherwise consented to [*24] act in this manner. The signing of the check alone is insufficient in this respect, particularly when Plaintiff provides no evidence to contradict James Truan's statements that he did not review the carbon back of the check at issue, and

---

[4] The inquiry is more difficult in this respect because one of the only individuals who apparently interacted with, B2B—Barry Truan—testified that "he could not recall" in response to numerous questions on this subject including with regard to the alleged list of fax numbers of registered users and dealers provided to B2B, and whether he approved the fax in question.

"routinely signs checks from Trynex's petty cash account without investigating the reason for the check." (R. 199-9, Truan Decl. ¶¶ 3-7 (Nov. 22, 2011).)) Nor does Plaintiff dispute that James Truan never communicated with Caroline Abraham or B2B. (Def.'s 56.1 Resp. ¶ 42.). [5] As such, Plaintiff has failed to present more than the "scintilla" of evidence necessary to survive summary judgment.

Accordingly, the Court grants Defendants' Motion with respect to James Truan. [6]

---

[5] This outcome is consistent with cases considering personal liability of corporate officers for acts undertaken on behalf of a corporation under the TCPA. These cases require a far more significant level of involvement of the corporate officer than any conduct alleged here. See Am. Blastfax, Inc., 164 F. Supp. 2d at 898 (noting the corporate officers were "the two persons who controlled all of Blastfax's day-to-day operations" and had "direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct"); Mais v. Gulf Coast Collection Bureau, Inc., 11-61936-CIV-SCOLA, No. 11-cv-61936, 2013 U.S. Dist. LEXIS 43485, 2013 WL 1283885, at *1 (S.D. Fla. Mar. 27, 2013) [*25] (holding no personal liability for officer who attempted to implement policies conforming with the TCPA but was not actively or personally involved in the collection of the debt).

[6] Plaintiff contends that Defendants' Motion for Summary Judgment is no more than an attempt to take a "third bite at the apple," given the Court's denial of both Defendants' motion for partial summary judgment on similar grounds and motion for reconsideration of that order. Previously, in denying Defendants' motion for partial summary judgment as to James Truan, the Court held that the fact that James Truan signed the check with the notation "Blast Fax" created a genuine dispute as to Mr. Truan's liability. (R. 65, Order 2.) Subsequently, in their motion to reconsider this ruling, Defendants submitted a declaration from Mr. Truan, in which he stated that the notation "Blastfax" on the back of the check was "not [his] handwriting" and that he "never saw the carbon back of the check drafted to Business to Business" until May 2, 2011, [*26] as well as a declaration from Barry Truan stating he "placed the notation 'Blast Fax' on the carbon back [of the check] after James Truan signed the check." (R. 74-1, ¶¶ 6-7.; R. 74-2, ¶ 6.) At the time, the Court properly refused to consider this evidence as grounds for reconsideration because it was available to Defendants when they filed the original Motion. (See R. 97, at 3) (noting "motions for reconsideration cannot be used to introduce evidence that could have been presented earlier." (citing Eqonmwan v. Cook Cty. Sheriff's Dep't, 602 F.3d 845, 852 (7th Cir. 2010).) Although Defendants have submitted the same evidence in support of their present Motion, the record as a whole and the arguments for which such evidence is relevant are more fully

## III. Damages

Under Section 227(b), "[a] person or entity" may bring an action to recover the greater of either the "actual monetary loss" from a violation of § 227(b) or "to receive $500 in damages for each such violation." [*27] 47 U.S.C. § 227(b)(3)(B). Plaintiff on behalf of the class seeks $4,098,000 in statutory damages for 8,196 violations of the TCPA, and a total award upon trebling the damages of $12,294,000.00. (R. 224, Pl.'s Reply 13.) Defendants argue that the proposed $4,098,000 award violates the Due Process Clause of the Fifth Amendment and that the Court should not treble the damages. Both issues are premature for resolution at this time. The Court will not address these issues if and until Plaintiff and the class prevail at trial.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment as to James Truan and denies it as to Trynex, Inc.

Date: September 3, 2013

ENTERED

/s/ Amy J. St. Eve

AMY J. ST. EVE

United States District Court Judge

---

End of Document

---

developed. In addition, Plaintiff has neither put forth evidence contesting Mr. Truan's statements nor demonstrated that it will be prejudiced by the Court's consideration of the evidence. Accordingly, Plaintiffs argument fails.

JOANNA LIAPES